Charles L. KOLBE and Karen
S. Kolbe, Appellants,

v.

STATE of Iowa, Alan E. Kimura, and
H. Culver Boldt, Appellees.

No. 02–0411.

Supreme Court of Iowa.

May 7, 2003.

Wythe Willey of Wythe Willey Law Office, Cedar Rapids, and Matt J. Reilly of White & Johnson, P.C., Cedar Rapids, for appellants.

James E. Shipman and Allison M. Heffern of Simmons, Perrine, Albright & Ellwood, P.L.C., Cedar Rapids, and Richard M. Tucker of Phelan, Tucker, Mullen, Walker, Tucker & Gelman, L.L.P., Iowa City, for appellees.

STREIT, Justice.

Charles Kolbe was struck by a car driven by Justin Allen Schulte who is blind looking head-on. Kolbe and his wife sued Shulte's physicians who had given opinions to the Iowa Department of Transportation (IDOT) stating Schulte was competent to drive. The district court found the physi-

cians were not negligent because they did not owe a duty to the Kolbes. We agree with the district court and affirm.

## I. Background and Facts

Justin Allen Schulte has a common form of inherited juvenile macular degeneration called Stargardt's Disease.[1] This disease renders Schulte blind looking straight-on. He must use his peripheral vision to see. Doctors Alan Kimura and H. Culver Boldt, state employees, were Schulte's ophthalmologists. Schulte's condition has not changed since the initial diagnosis in 1990.

In 1993, when Schulte was fourteen years old, he applied for a learner's permit to drive. The application was denied because Schulte failed the vision examination. One year later, Schulte requested review of his application for a learner's permit pursuant to Iowa Administrative Code rule 761–604.13(4) (1995).[2] The earlier denial of Shulte's application was affirmed. In 1995, Schulte requested another review of the denial of his application for an operator's permit. Shulte's ophthalmologist, Dr. Kimura, completed a form to

help Schulte obtain a driver's license. Dr. Kimura filled out the IDOT "Driver Visual Acuity Report" stating Schulte's visual acuity and that he had normal peripheral vision. In the report, Dr. Kimura said Schulte was competent to drive with some restrictions. Schulte took and passed both the oral driving exam and another driving test that required him to identify traffic signs and other vehicles. The IDOT Medical Advisory Board reviewed Schulte's case and all four doctors recommended Schulte be given an operator's permit with some restrictions.

Schulte's permit authorized him to drive with the following restrictions: Schulte could not drive without corrective lenses, he could not drive when headlights were required, he could not drive in excess of thirty-five miles per hour, and he would have to undergo a driving test with a hearing officer prior to the issuance of a license. In the summer of 1996, Schulte's license came up for renewal. Dr. Kimura wrote two letters to the IDOT recommending Schulte should be permitted to drive forty-five miles per hour and to drive at

---

1. According to the American Macular Degeneration Foundation, Stargardt's Disease affects one in 10,000 people and usually manifests itself between the ages of seven and twelve.

    Scientists' current theory is that Stargardt's causes the eye's central vision to deteriorate because the rod cells just outside the macula erode and this eventually harms the retinal pigment epithelium (RPE). As the RPE fails, the disease may spread to the macula's cone cells, causing macular degeneration's characteristic loss of central vision. Peripheral vision generally remains. Presently there is no cure for Stargardt's Disease, nor is there any treatment that is proven to improve visual loss or to retard the progression of the disease.

    American Macular Degeneration Foundation, *Stargardt's Disease* available at *http://macular.org/stargardts.html* (last visited March 25, 2003).

2. Iowa Administrative Code rule 761–604.13(4) provides, in part:

    a. An applicant ... who cannot meet the vision standards in subrule 604.13(2) may submit a written request for review by an informal settlement officer.

    b. Based upon consideration of the applicant's vision screening results or vision report, driving test and driving record, the written recommendation of the applicant's licensed vision specialist, and traffic conditions in the vicinity of the applicant's residence, the officer may recommend issuing a license with restrictions suitable to the applicant's capabilities. However:

    (1) An applicant who cannot attain a visual acuity of 20/100 with both eyes or with the better eye may be considered for licensing only after recommendation by the medical advisory board....

    Iowa Admin. Code r. 761–604.13(4) (1995).

night. Schulte took the road test and passed.

The IDOT required a review of Schulte's license again in May 1997. In 1997, Dr. Kimura moved out of state and he transferred Schulte's case to Dr. H. Culver Boldt. After this point, Dr. Kimura was no longer involved in Schulte's case. In March 1997, Dr. Boldt sent a letter to the IDOT stating it was reasonable for Schulte to have his restricted driving privileges renewed. Dr. Boldt also stated Schulte was competent to drive. Again, Schulte, now eighteen years old, took the road test and passed.

Almost three months after Schulte passed his last road test renewing his driving privileges, he struck a bicyclist causing serious injuries. Charles and Susan Kolbe were riding bicycles on a two-lane, paved road. They were moving east in the eastbound lane "well to the right of the center line of the roadway." Schulte was driving between forty-five and fifty miles per hour eastbound on the same road. Using his peripheral vision, Schulte first saw Susan when he was about 150 to 200 feet behind her. As Schulte passed Susan, he slowed down to about ten miles per hour and nearly hit her. Schulte, not seeing Charles, continued driving in a straight line and increased his speed to forty-five to fifty miles per hour. Schulte hit Charles driving in excess of his speed restriction. Charles was thrown into the air over the front of Schulte's car, hit the left side of the windshield and roof, and then landed on the ground beyond the car. Charles was severely injured.

Kolbes sued Schulte, his parents, and their insurers. These parties have settled and are no longer a part of the present action. Schulte also sued the IDOT asserting it was negligent in issuing an operator's permit to Schulte. Finding the IDOT did not have a duty to the Kolbes,

the district court granted the IDOT's motion for summary judgment and we affirmed on appeal. *Kolbe v. State*, 625 N.W.2d 721 (Iowa 2001). The case before us centers on Kolbes' suit against Schulte's doctors. Kolbes allege Schulte's doctors were negligent in rendering opinions to the IDOT certifying Schulte's competence to drive. Kolbes assert the State of Iowa, as the doctors' employer, is liable under the theory of respondeat superior. The state filed a motion for summary judgment which the district court granted. The court concluded the doctors did not have a duty to the Kolbes and as such there can be no liability. Kolbes appeal.

## II. Scope of Review

We review the trial court's grant of summary judgment for correction of errors of law. *Mason v. Schweizer Aircraft Corp.*, 653 N.W.2d 543, 547 (Iowa 2002). Summary judgment is appropriate when "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Iowa R. Civ. P. 1.981(3) (2001). We review the record in the light most favorable to the non-moving party. *Mason*, 653 N.W.2d at 547.

## III. Merits

The central issue in this appeal is whether a physician owes a duty to persons not within the physician/patient relationship. Specifically, we focus on whether physicians owe a duty to unknown third parties when rendering an opinion to the Iowa Department of Transportation regarding a patient's competency to drive. Under common law, to succeed on their negligence claim, Kolbes must prove four elements: 1) Schulte's physicians owed Kolbes a legal duty; 2) the physicians breached that duty; 3) the breach was a proximate cause of Charles's injuries; and

4) the amount of damages. *Kolbe,* 625 N.W.2d at 725. The physicians argue there was no duty or, alternatively, Kolbes did not establish proximate cause.

The existence of a legal duty is a question of law. *J.A.H. v. Wadle & Assocs.,* 589 N.W.2d 256, 258 (Iowa 1999). In Kolbes' suit against the IDOT, we articulated the factors to consider in determining whether there is a legal duty:

1. The relationship between the parties;
2. Reasonable foreseeability of harm to the person who is injured; and
3. Public policy considerations.

*Kolbe,* 625 N.W.2d at 728 (citing *J.A.H.,* 589 N.W.2d at 258). We stated "[w]e use these factors under a balancing approach and not as three distinct and necessary elements. In the end, whether a duty exists is a policy decision. . . ." *Id.* (citation omitted). We must determine whether Schulte's physicians had a legal duty toward Kolbes. The district court found the physicians did not have a duty to Kolbes. For the reasons stated below, we agree with the district court.

### A. Special Relationship

The general rule is that a person has no duty to prevent a third person from causing harm to another. *Kelly v. Sinclair Oil Corp.,* 476 N.W.2d 341, 354 (Iowa 1991). However, a duty may be present when a special relationship exists between the parties. *Keller v. State,* 475 N.W.2d 174, 179 (Iowa 1991). A special relationship may exist where there is an alleged failure of a defendant to "aid or protect another person or to control the conduct of a third party." *Kolbe,* 625 N.W.2d at 728. Under these circumstances, section 315 of the Restatement (Second) of Torts applies, stating:

> There is no duty so to control the conduct of a third person as to prevent him from causing physical harm to another unless
>
> (a) a special relation exists between the actor and the third person which imposes a duty upon the actor to control the third person's conduct, or
>
> (b) a special relation exists between the actor and the other which gives to the other a right to protection.

Restatement (Second) of Torts § 315 (1965).

Though privity alone is not determinative of whether a duty exists, in the present case Schulte's physicians and Kolbes were not in privity. *See J.A.H.,* 589 N.W.2d at 261. Despite the lack of privity, Kolbes allege the doctors had a duty to protect Charles and the public at large from any danger Schulte posed to other motorists and pedestrians. However, there is no more of a special relationship between Shulte's physicians and Kolbes than there is between the physicians and the entire driving public. No relation exists between the physicians and Kolbes that is sufficiently close and direct to support a legal claim against the physicians for Charles's injuries.

Kolbes also allege the physicians had a duty to control Schulte and prevent him from driving. The physicians neither had a duty to control Schulte's actions nor to protect Kolbes. The Restatement (Second) of Torts sections 316 through 319 discuss the types of special relations that are contemplated as creating a duty to a third party. This case is not about the duty of a parent to control a child, the duty of a master to control a servant, the duty of a possessor of land to control a licensee, or the duty of those in charge of a person having dangerous propensities. Rather, the physicians' involvement with Schulte

was the same as their involvement would have been with any other patient. The physicians performed medical examinations, treated Schulte for his condition, and advised him of the effects of Stargardt's Disease. This type of involvement is not tantamount to exercising control over the patient or preventing the patient from harming others. There is no evidence in the record to prove the existence of a special relationship between Schulte and his physicians so as to provide Kolbes' with a cause of action against the physicians for Charles's injuries.

### B. Foreseeability

In addition to considering the nature of the relationship between the parties, we also reflect on the foreseeability of the harm to the injured person. Kolbes argue the physicians should have recognized the need to protect the public and assumed the duty to protect it from Schulte. Specifically, Kolbes assert the physicians should have foreseen that their recommendation to the department of transportation of Schulte's competence to drive would have resulted in Schulte obtaining an operator's permit and ultimately in injuring Kolbe.

■■ The physicians were not responsible for issuing the operator's permit. That decision was made by the IDOT. *See* Iowa Admin. Code r. 761–604.1(1) (1995). The Iowa Department of Transportation has authority, under appropriate circumstances, to issue an operator's license to a person with Stargardt's Disease. *See* Iowa Admin. Code r. 761–604.13(4) (1995). The recommendation of Schulte's physicians was but one factor considered by the IDOT in its decision to issue Schulte an operator's permit. The IDOT also considered the opinion of an independent medical review board in determining whether Schulte was competent to drive. In providing the IDOT with Schulte's visual acuity reports and their professional medical recommendations, the physicians could not have foreseen whether the IDOT would ultimately issue Schulte the permit.

The IDOT was more directly involved than Schulte's physicians in deciding whether Schulte satisfied the requirements for an operator's permit. We previously found the IDOT did not owe a duty to Kolbes in making this decision. *Kolbe*, 625 N.W.2d at 730. In so finding, we rejected Kolbes' attempt to claim membership in a special, identifiable group, i.e., the public at large, to which the IDOT allegedly owed a duty of due care. *Id.* In *Kolbe*, we said the state cannot be liable unless there is a special relationship existing between the victim and the state. *Id.* Kolbes did not assert the particular circumstances of their case gave rise to a special relationship. *Id.* We did not say that by virtue of the IDOT's issuance of an operator's permit to Schulte, it was foreseeable that *Charles* would be injured. *Id.* In the case before us, Schulte's physicians' involvement is even more attenuated than that of the IDOT. When the physicians recommended Schulte as competent to drive, it was not foreseeable such opinion would cause injury to Charles.

■■ Kolbes have not proven there was a special relationship between Schulte's physicians and Kolbes. They have also failed to show it was reasonably foreseeable that Kolbe would be injured by Schulte. More important than these two issues is the issue of the public policy concerns implicated by imposing liability on physicians under such circumstances. As we stated above, the existence of a duty depends largely on public policy. *See Kolbe*, 625 N.W.2d at 728 (citing *J.A.H.*, 589 N.W.2d at 258). We now turn to this consideration.

## C. Public Policy Considerations

Kolbes significantly rely upon our holding in *Freese v. Lemmon* to argue Schulte's physicians owed Charles a duty. 210 N.W.2d 576 (Iowa 1973). However, our recent holding in *Schmidt v. Mahoney* overruled *Freese* to the extent it held an injured person had stated a claim for liability against a physician under sections 311 and 324A of the Restatement (Second) of Torts. *Schmidt*, 659 N.W.2d 552, 553 (Iowa 2003). We begin with a summary of the *Freese* case. In *Freese*, a pedestrian brought an action against a motorist and his physician to recover for damages sustained when the motorist struck the pedestrian as the result of a seizure. In determining whether the physician had a duty to the injured pedestrian, the *Freese* majority relied upon Restatement (Second) of Torts section 311 which provides,

(1) One who negligently gives false information to another is subject to liability for physical harm caused by action taken by the other in reasonable reliance upon such information, where such harm results

    (a) to the other, or

    (b) to such third persons as the actor should expect to be put in peril by the action taken.

(2) Such negligence may consist of failure to exercise reasonable care

    (a) in ascertaining the accuracy of the information, or

    (b) in the manner in which it is communicated.

Restatement (Second) of Torts § 311. In *Freese*, a majority of the court held that a petition alleging the physician's negligence in counseling his patient concerning a seizure disorder stated a valid claim on the part of the injured third party with whom the seizure patient collided on the highway. *Freese*, 210 N.W.2d at 579–80. Recently, in *Schmidt v. Mahoney*, we were called upon to revisit our holding in *Freese*. In *Schmidt*, we stated the application of the "broad general rules espoused in section 311 and section 324A of the Restatement ... to a claim by a member of the general public would run counter to" public policy considerations. *Schmidt*, 659 N.W.2d at 555.

In *Schmidt*, the plaintiff was injured when an approaching driver had a seizure, lost control of her car, and crashed into the plaintiff's car. *Id.* at 553. The physician advised his patient regarding her ability to operate a motor vehicle. He prescribed medications and otherwise treated his patient's seizure disorder. The physician, however, did not warn his patient of the danger her seizure disorder imposed upon her ability to drive a car. In fact, the physician advised his patient she could safely drive a car. The physician also provided to the Iowa Department of Transportation his recommendation that his patient was competent to drive.

The plaintiff in *Schmidt* argued the resolution of his case had already been decided by *Freese*. Dr. Mahoney asserted that since our decision in *Freese*, we have retreated from our holding stating that it is an unwarranted intrusion on the doctor/patient relationship to recognize a right of action in favor of a member of the general public based upon actions of a health-care provider in directing the activities of a patient. For example, in *J.A.H. v. Wadle & Associates*, we concluded a physician does not have a duty to a nonpatient third party in the setting of a medical malpractice action. 589 N.W.2d at 264–65. We stated,

A number of considerations relevant to the duty analysis strongly militate against imposition of duty here.... Concern about how a course of treatment might affect third parties could

easily influence the way in which therapists treat their patients. Under a rule imposing a duty of care to third parties, therapists would feel compelled to consider the possible effects of treatment choices on third parties and would have an incentive to compromise their treatment because of the threatened liability. This would be fundamentally inconsistent with the therapist's obligation to the patient.... Hoping to avoid liability to third parties, ... a therapist might instead find it necessary to deviate from the treatment the therapist would normally provide, to the patient's ultimate detriment. This would exact an intolerably high price from the patient-therapist relationship and would be destructive of that relationship.

*J.A.H.*, 589 N.W.2d at 262–63 (quoting *Doe v. McKay*, 183 Ill.2d 272, 233 Ill.Dec. 310, 700 N.E.2d 1018, 1023–24 (1998)). In *Schmidt* we cited *Leonard v. State*, a similar case dealing with the acts and omissions of mental health care providers. *Leonard*, 491 N.W.2d 508 (Iowa 1992). In *Leonard*, we recognized a special relationship exists between physician and patient, but determined "the risks to the general public posed by the negligent release of dangerous mental patients would be far outweighed by the disservice to the general public if treating physicians were subject to civil liability for discharge decisions." *Id.* at 512.

In finding a physician does not owe a duty to unknown third persons, we heavily relied upon these public policy reasons. It is of utmost importance that we do not compromise the physician's first loyalty and duty to his or her patient. *See Webb v. Jarvis*, 575 N.E.2d 992, 997 (Ind.1991); *Praesel v. Johnson*, 967 S.W.2d 391, 396 (Tex.Sup.Ct.1998) (rejecting *Freese* and holding physicians do not have a common law duty to third parties to warn epileptic patients not to drive).

[I]t is highly likely ... physicians treating patients with seizure disorders will become reluctant to allow them to drive or engage in any other activity in which a seizure could possibly harm a third party. In order to curtail liability, physicians may become prone to make overly restrictive recommendations concerning the activities of their patients and will exercise their role as reporters to the department of transportation in an inflexible manner not in their patient's best interests.

*Schmidt*, 659 N.W.2d at 555. The public policy concerns at the heart of our decisions in *Schmidt* and *Kolbe* are equally applicable to the case before us.

■ It is not the physician's duty to protect all third parties who might come into contact with the physician's patient. *Estate of Witthoeft v. Kiskaddon*, 450 Pa.Super. 364, 676 A.2d 1223, 1225 (1996). Imposing a duty upon physicians under the circumstances before us would impinge upon the physician's primary obligation, which is to treat his or her patient. *See Cram v. Howell*, 680 N.E.2d 1096 (Ind. 1997). To discount the importance of foreseeability in cases such as the one before us is to extend liability limitlessly to treating physicians vis-à-vis third party victims. *See Estate of Witthoeft*, 676 A.2d at 1225. The same public policy concerns we had in *Kolbe* are relevant here.

A recognition of the tort for "negligent issuance of a driver's license" would likely chill the State's licensing determinations, making it unreasonably difficult for certain segments of our society to secure a driver's license. Senior citizens with declining vision and visually impaired citizens, both of whom would ordinarily pass existing stringent state requirements, would face the possibility of not driving at all.

*Kolbe,* 625 N.W.2d at 730. Such unlimited exposure to liability could chill physicians' willingness to recommend driver's licensing for any patient who is even visually impaired. Imposition of liability would create physicians' divided loyalty between the welfare of patients, to whom they have a primary responsibility, and the welfare of the unknown public.

### IV. Conclusion

■ Our decision today is consistent with and compelled by public policy considerations and our previous holding in *Schmidt.* As such, we agree with the district court that Schulte's physicians owed no duty to Kolbes. Kolbes were not foreseeable victims of the physicians' action or inactions. Kolbes did not establish a special relationship existed between them and the physicians. At the public policy level, a physician does not have a duty to "protect[] the entire public from any harm that might result from his or her patient's actions." *Crosby by Crosby v. Sultz,* 405 Pa.Super. 527, 592 A.2d 1337, 1344 (1991). Rather, physicians must be able to fulfill their duty to patients without fear of third party liability claims for the acts of patients over which physicians have no control. *Webb,* 575 N.E.2d at 997; *Crosby by Crosby,* 592 A.2d at 1344. Because the physicians did not owe a duty to protect Kolbes, the negligence action fails. The motion for summary judgment was properly granted and we affirm.

**AFFIRMED.**