# IN THE SUPREME COURT
# STATE OF NORTH DAKOTA

2019 ND 234

Margaret Cichos, individually, and as the
surviving spouse of Bradley Cichos, and as
Personal Representative of the Estate of
Bradley Cichos, deceased, Lyman Halvorson,
individually, Kenzie Halvorson,
individually, Landon and Sierra Halvorson
as parents and natural guardians of A.H.
DOB 2011, a minor child, each individually
and collectively as assignees of Lyle Lima,
Lyle Lima, individually,                          Plaintiffs and Appellants

    v.

Dakota Eye Institute, P.C., Dakota
Eye Institute, LLP, Briana Bohn, O.D.,
individually,                                     Defendants and Appellees

No. 20180347

Appeal from the District Court of Pierce County, Northeast Judicial District, the Honorable Donovan J. Foughty, Judge.

AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.

Opinion of the Court by Tufte, Justice.

Daniel M. Traynor (argued) and Jonathon F. Yunker (appeared), Devils Lake, N.D., for plaintiff and appellant Margaret Cichos.

Timothy M. O'Keeffe (on brief), Fargo, N.D., for plaintiffs and appellants Lyman and Kenzie Halvorson.

Mark V. Larson (appeared), Minot, N.D., for plaintiffs and appellants Landon and Sierra Halvorson.

Jason R. Vendsel (on brief), Minot, N.D., for plaintiff and appellant Lyle Lima.

Tracy V. Kolb (argued), Bismarck, N.D., for defendants and appellees.

**Tufte, Justice.**

[¶1]     Plaintiffs appeal from the district court's judgment and amended judgment dismissing their complaint. The parties dispute whether a physician in North Dakota owes a duty to third parties to warn a patient regarding vision impairments to driving; whether medical malpractice claims are assignable; and whether the medical expert affidavit met the requirements of N.D.C.C. § 28-01-46. We conclude physicians do not owe a duty to third parties under these circumstances, Lima's malpractice claim is assignable, and the expert affidavit was sufficient to avoid dismissal. We remand for further proceedings.

I

[¶2]     In their first amended complaint, the plaintiffs alleged the following facts. In May 2016, Lyle Lima was driving his truck on a highway when he collided with a horse-drawn hay trailer. The collision killed one of the five passengers on the horse-drawn trailer and injured the others. In April 2015, a doctor at Dakota Eye Institute determined Lima to be legally blind, prepared a certificate of blindness, and instructed Lima and his spouse that he was not to drive. In April 2016, about six weeks before the collision, a second Dakota Eye Institute doctor, Briana Bohn, examined Lima. Dr. Bohn measured Lima's vision as being "improved" and "told Lyle Lima he could drive, with some restrictions." Plaintiffs claimed Dr. Bohn was liable for medical malpractice because Lima's eyesight, although improved, was still below the minimum vision standards required to operate a vehicle in North Dakota under N.D. Admin. Code ch. 37-08-01.

[¶3]     The injured parties and their representatives made a claim against Lima, which he could not fully satisfy. In partial settlement of the claim, Lima assigned his medical malpractice claim against Dakota Eye Institute and any recovery he might receive to

1

the other plaintiffs. The injured parties and Lima then filed this suit individually and as assignees of Lima against Dr. Bohn, Dakota Eye Institute P.C., and Dakota Eye Institute LLC. The defendants filed two motions to dismiss: one arguing Lima's claims were not assignable and should be dismissed under N.D.R.Civ.P. 12(b)(6), and one arguing the affidavit failed to meet the requirements of N.D.C.C. § 28-01-46. At the hearing on the motions, the parties also argued whether North Dakota law extends liability for medical malpractice to a third party who was not a patient. The district court granted the motions to dismiss.

## II

[¶4]    In *Ramirez v. Walmart*, we explained:

> A motion to dismiss under N.D.R.Civ.P. 12(b)(6) tests the legal sufficiency of the claim presented in the complaint. On appeal, we construe the complaint in the light most favorable to the plaintiff and accept as true the well-pleaded allegations in the complaint. This Court will affirm a judgment dismissing a complaint for failure to state a claim under N.D.R.Civ.P. 12(b)(6) if we cannot discern a potential for proof to support it. We review a district court's decision granting a motion to dismiss under N.D.R.Civ.P. 12(b)(6) de novo.

2018 ND 179, ¶ 7, 915 N.W.2d 674 (internal citations and quotation marks omitted).

## III

[¶5]    Appellants argue Dr. Bohn owed a duty to the injured parties to warn Lima that his vision was below the minimum standard to operate an automobile. Third party liability for medical malpractice is an issue of first impression in North Dakota. Appellants cite several cases from other jurisdictions in support of a duty to third parties in various circumstances. Many of these cases involve physicians prescribing or administering medications and failing to warn about side effects. Such cases are of limited persuasive value here where no medication was administered to Lima. In situations similar to this one, other jurisdictions are divided, but we find more persuasive those that state there is no third party duty to warn a patient based on public policy considerations.

[¶6] "[I]n a negligence action, whether or not a duty exists is generally an initial question of law for the court." *Bjerk v. Anderson*, 2018 ND 124, ¶ 10, 911 N.W.2d 343 (quoting *APM, LLLP v. TCI Ins. Agency, Inc.*, 2016 ND 66, ¶ 8, 877 N.W.2d 34 (internal citation omitted)).

> The court must balance the following factors when determining the existence of duty in each particular case: (1) foreseeability of harm to plaintiff; (2) degree of certainty that plaintiff suffered injury; (3) closeness of connection between defendant's conduct and injury suffered; (4) moral blame attached to defendant's conduct; (5) policy of preventing future harm; (6) extent of burden to defendant and the consequences to the community of imposing a duty to exercise care with resulting liability for breach; and (7) availability, cost and prevalence of insurance for the risk involved.

*Bjerk*, at ¶ 18 (quoting *Hurt v. Freeland*, 1999 ND 12, ¶ 13, 589 N.W.2d 551 (quoting W. Page Keeton et al., *Prosser and Keeton on the Law of Torts* § 53, at 359 n.24 (5th ed. 1984))). Although "[i]mposition of a duty on these facts is a policy-laden question better suited to legislative judgments . . . courts must sometimes consider public policy in determining whether a duty of care applies in a particular situation." *Bjerk*, at ¶ 24.

[¶7] In *Kolbe v. State*, 661 N.W.2d 142 (Iowa 2003), Charles Kolbe was struck by a vehicle driven by Justin Schulte. *Id.* at 143. Schulte had a form of macular degeneration called Stargardt's Disease which leaves him blind when looking directly ahead and requires him to use his peripheral vision to see. *Id.* at 143-44. Three doctors wrote letters to the Iowa Department of Transportation ("IDOT") recommending Schulte be permitted to drive with restrictions. *Id.* Schulte collided with Kolbe while Kolbe and his wife were riding bicycles. *Id.* at 145. The Kolbes sued Schulte's doctors under a theory of negligence in recommending to IDOT that Schulte be permitted to drive with restrictions. *Id.*

[¶8] The *Kolbe* court analyzed the issue of "whether a physician owes a duty to persons not within the physician/patient relationship." *Id.* Three factors were weighed to determine if there was a duty: (1) the parties' relationship, (2) reasonable foreseeability of harm to the injured person, and (3) public policy considerations.

*Id.* at 146. The court weighed these factors "under a balancing approach and not as three distinct and necessary elements. . . . [W]hether a duty exists is a policy decision." *Id.* "More important than [the first two factors] is the issue of the public policy concerns implicated by imposing liability on physicians under such circumstances. As we stated above, the existence of a duty depends largely on public policy." *Id.* at 147. The court noted there was no privity between the Kolbes and the doctors and the harm to Kolbe was not a foreseeable result of the doctors' recommendations. *Id.* at 146-47.

[¶9]    The *Kolbe* court expressed particular concern regarding how physicians' concerns over third party liability might affect how they treat their patients, thus compromising treatment. *Id.* at 148-49. A "therapist might . . . find it necessary to deviate from the treatment [he] would normally provide." *Id.* at 149 (quoting *J.A.H. v. Wadle and Associates*, 589 N.W.2d 256, 263 (Iowa 1999)). Such incentives would destroy the patient-physician relationship. *Id.* "[P]hysicians may become prone to make overly restrictive recommendations concerning the activities of their patients." *Id.* (quoting *Schmidt v. Mahoney*, 659 N.W.2d 552, 555 (Iowa 2003)). The court concluded that at "the public policy level, a physician does not have a duty to 'protect the entire public from any harm that might result from his or her patient's actions.'" *Id.* at 150 (quoting *Crosby by Crosby v. Sultz*, 592 A.2d 1337, 1344 (Pa. Super. Ct. 1991)). "Rather, physicians must be able to fulfill their duty to patients without fear of third party liability claims for the acts of patients over which physicians have no control." *Id.* The physician's primary obligation is to treat the patient. *Id.* at 149.

[¶10]   In *Estate of Witthoeft v. Kiskaddon*, 733 A.2d 623 (Pa. 1999), Witthoeft was bicycling when she was struck by a vehicle driven by Helen Myers. *Id.* at 624. Myers had been examined by Dr. Kiskaddon, an ophthalmologist, who determined Myers had a combined visual acuity of 20/80. *Id.* The plaintiffs sued Dr. Kiskaddon for failing to inform Myers that she was "not 'legally authorized' to drive a motor vehicle" and for failing to report the results of Myers's examination to the DOT as required by law. *Id.* at 624-25. The court analyzed whether "a physician may be held

4

liable for injuries suffered by a third party in an automobile accident caused by the physician's patient." *Id.* at 624. "[S]pecifically, will an ophthalmologist be held liable to a third party where the ophthalmologist failed to inform his patient . . . of the patient's poor visual acuity" and she injured someone while driving. *Id.* The court stated, "[W]e believe that it is an unreasonable extension of the concepts of duty and foreseeability to broaden a physician's duty to a patient and hold a physician liable to the public at large within the factual scenario of this case." *Id.* at 630. The court continued, "This is especially true where, as here, Dr. Kiskaddon did not cause or aggravate a medical condition that affected the patient's driving and the patient was necessarily aware of her medical condition." *Id.*

[¶11]   In *Jarmie v. Troncale*, 50 A.3d 802 (Conn. 2012), Dr. Troncale diagnosed and treated Mary Ann Ambrogio for kidney and liver aliments, including hepatic encephalopathy, which impaired her ability to safely operate a motor vehicle. *Id.* at 805. Ambrogio crashed into the plaintiff, John Jarmie. *Id.* The plaintiff alleged his injuries were a result of Dr. Troncale's failure to warn Ambrogio not to drive. *Id.* The court analyzed duty by first considering foreseeability. *Id.* at 809. However, a "simple conclusion that the harm to the plaintiff was foreseeable . . . cannot by itself mandate a determination that a legal duty exists." *Id.* "Many harms are quite literally foreseeable, yet for pragmatic reasons, no recovery is allowed. A further inquiry must be made, for we recognize that duty is not sacrosanct in itself but is only an expression of the sum total of those considerations of policy which lead the law to say that the plaintiff is entitled to protection." *Id.* at 809-10. "The final step in the duty inquiry, then, is to make a determination of the fundamental policy of the law, as to whether the defendant's responsibility should extend to such results." *Id.* at 810.

[¶12]   The *Jarmie* court examined Connecticut precedent and found no support for extension of duty beyond the patient-physician relationship. *Id.* at 811. Connecticut courts previously found harm foreseeable only when the victim was identifiable. *Id.* at 811-14. The court then turned to public policy considerations supporting each side. The "final step in the duty inquiry is to make a determination of the fundamental

policy of the law, as to whether the defendant's responsibility should extend to such results." *Id.* at 814. The *Jarmie* court determined public policy weighed in favor of the defendant physician because physicians "[1] do not expect to be held accountable to members of the general public for decisions regarding patient treatment, [2] optimal treatment of patients is frustrated by extending a physician's liability to unidentifiable third persons and [3] extending liability would lead to increased litigation and higher health care costs." *Id.*

[¶13]   The *Jarmie* court determined that putting physicians under third party duty would not meet the purposes of tort compensation, *i.e.*, compensation of innocent parties, shifting loss to responsible parties, and deterrence of wrongful conduct. *Id.* When examining compensation, the court noted a victim could receive compensation elsewhere, for example, through the driver's insurance. *Id.* at 815. The court determined the burden on physicians and the physician-patient relationship, and potentially high costs of litigation, would not necessarily be outweighed by the financial cost to victims. *Id.* Even if the physician has not warned the driver, he may not be responsible for an accident if the driver was engaging in other activities such as speeding or driving while intoxicated. *Id.* Looking to loss distribution, the court expressed concern that a physician's failure to warn a patient prior to an accident could result in unfair liability to the physician. *Id.* A driver may not heed the warning, so the *Jarmie* court reasoned that a physician would be liable when the harm might not have been prevented anyway. *Id.* "With respect to the deterrence of wrongful conduct, the proximate cause of a driving accident is the conduct of the driver." *Id.* A patient may drive despite a warning, limiting deterrence of wrongful conduct; thus liability for failure to warn would require more of physicians than they already owe to their patients. *Id.* at 815-16. Liability would also "interfere with the physician-patient relationship and give rise to increased litigation." *Id.* at 816.

[¶14]   The *Jarmie* court looked at specific factors: "(1) the normal expectations of the participants in the activity under review; (2) the public policy of encouraging participation in the activity, while weighing the safety of the participants; (3) the

6

avoidance of increased litigation; and (4) the decisions of other jurisdictions." *Id.* First, within a physician-patient relationship, the physician has a duty to the patient under common law principles, but this duty traditionally does not extend to third parties. *Id.* at 817. Second, the court said such an extension of liability would be "problematic, at best, because it would be inconsistent with the physician's duty of loyalty to the patient, would threaten the inherent confidentiality of the physician-patient relationship and would impermissibly intrude on the physician's professional judgment regarding treatment and care of the patient." *Id.* at 818. Extension of duty would threaten confidentiality and affect how physicians treat their patients. *Id.* at 819, 820, 822. Physicians may advise patients against any activity that might harm a third party, giving far more restrictive advice than necessary in order to avoid litigation. *Id.* at 820-21. A physician who faces potential liability may give advice based not on an individual patient's condition, but rather on reducing the physician's risk of exposure to unknown members of the public who may interact with the patient. *Id.* at 822. In addition, an increase in litigation would be likely because a new category of plaintiffs arises when liability is extended to physicians, potentially driving up healthcare costs. *Id.* at 822-23. Finally, the court determined there was no clear trend among other jurisdictions. *Id.* at 826.

[¶15]   In addition to these three decisions, other jurisdictions have also considered extension of third party duty in similar circumstances and also declined to impose such a duty. *See Medina v. Hochberg*, 987 N.E.2d 1206 (Mass. 2013) (distinguishing duty to warn patient about side effects of treatment while rejecting asserted duty to warn patients about driving risks from underlying medical condition) ; *Schmidt v. Mahoney*, 659 N.W.2d 552 (Iowa 2003) (affirming dismissal of third party negligence claim against physician who advised a patient with seizure disorder that she could safely drive). Although the appellants cite several cases in support of their arguments, they are not persuasive. Most of the cited cases involve facts where the physician has prescribed medications or administered medications, vaccinations, or dialysis and failed to warn about side effects of the treatment given to the patient.

[¶16]   On the facts here, we consider more persuasive the cases that examine and reject a duty to third parties arising from a failure to warn a patient having a medical condition that increases driving risk. The facts alleged in the complaint support an inference of foreseeability in the sense that a person with impaired vision who drives a motor vehicle foreseeably will cause a traffic accident. However, the defendants did not treat or provide medication to Lima that led to the vision impairment. We find the public policy concerns expressed in the decisions discussed above to be determinative, and we decline to extend a physician's duty to encompass the situation presented here. We conclude a physician has no duty to third parties arising from the physician's failure to warn a patient about driving risks resulting from the patient's medical condition.

IV

[¶17]   Next the plaintiffs argue that the district court erred in dismissing their collective claim as assignees of Lima's claims against the defendants. Assignability of a chose in action has long been recognized in North Dakota law. *See Roberts v. First Nat'l Bank of Fargo*, 8 N.D. 474, 79 N.W. 993 (1899).

> The right to bring an action or recover a debt or money is a chose in action, and a chose in action is a form of property. [A] "chose in action" is a legal claim or a right to bring an action to receive or recover a debt, money, or damages by a judicial proceeding, and is intangible personal property. An assignment transfers a property right, interest, or claim from the assignor to the assignee. Generally, a person may assign a legal claim or a chose in action.

*In re Guardianship of V.A.M.*, 2015 ND 247, ¶ 17, 870 N.W.2d 201 (internal citations omitted). An absolute assignment generally divests the assignor of all control and right to the cause of action, and the assignee is entitled to control the cause of action and to receive the benefits. *Id.* at ¶ 18. "There is a general right to assign common law and statutory rights unless there is an express prohibition in a statute or a showing that an assignment would clearly offend an identifiable public policy." 6 Am. Jur. 2d *Assignments* § 7 (2019). Exceptions to assignability include actions of "wrongs done

8

to the person, the reputation, of the feelings of the injured party, and to contracts of a purely personal nature, like promises of marriage." *Goodley v. Wank & Wank, Inc.*, 133 Cal. Rptr. 83, 84-85 (Cal. Ct. App. 1976). Thus, we start our analysis from the premise that claims are generally assignable and determine whether there is an exception that applies here.

[¶18] Defendants argue that medical malpractice claims are not assignable because they are intensely personal claims like personal injury claims that are generally not assignable and also because they stem from the duties in the confidential physician-patient relationship. The defendants compare the current medical malpractice claim to personal injury claims and legal malpractice claims, both of which are generally not assignable. *See, e.g., Regie de l'assurance Auto. du Quebec v. Jensen*, 399 N.W.2d 85, 89 (Minn. 1987) (personal injury claim not assignable); *Goodley v. Wank & Wank, Inc.*, 133 Cal. Rptr. 83 (Cal. Ct. App. 1976) (legal malpractice claim not assignable); *AMCO Ins. Co. v. All Solutions Ins. Agency, LLC*, 198 Cal. Rptr. 3d 687, 694 (Cal. Ct. App. 2016) ("the exceptions to the general rule favoring assignability of causes in action include tort causes of action for wrongs done to the person, the reputation or the feelings of an injured party . . . [or] legal malpractice claims and certain types of fraud claims"); 6 Am. Jur. 2d *Assignments* § 57 (2019). Plaintiffs argue that Lima's claim is purely economic because he suffered no personal injury and his damages consist solely of money he owes to others as a result of the claimed malpractice.

[¶19] We have not previously addressed whether a medical malpractice claim is excepted from the general rule that claims may be assigned. However, in the context of Medicaid, we have acknowledged specific statutory authority providing for assignment of "medical costs incurred," including malpractice claims for pain and suffering. *Grey Bear v. North Dakota Dep't of Human Servs.*, 2002 ND 139, 651 N.W.2d 611. The issue presented here is one of first impression in North Dakota.

[¶20] The longstanding general rule is that on "grounds of public policy, the sale or assignment of actions for injuries to the person are void." *North Chicago St. R. Co. v. Ackley*, 49 N.E. 222, 225 (Ill. 1897). Here, there is no assignment of an action for

9

personal injury to Lima, only an assignment of his claim for reimbursement from defendants. The "injuries resulting [here] are not personal injuries, in the strict sense of injuries to the body, feelings or character." *Joos v. Drillock*, 338 N.W.2d 736, 739 (Mich. Ct. App. 1983). Lima's claim against the defendants derives from his liability to the injured parties for money damages resulting from the collision. If medical malpractice by the defendants is the proximate cause of monetary damages Lima became obligated to pay, it implicates none of the public policy concerns typically associated with personal injury claim assignments. *See Ackley,* 49 N.E. at 225; *Lingel v. Oblin*, 8 P.3d 1163, 1166-67 (Ariz. Ct. App. 2000); *Dodd v. Middlesex Mut. Assurance Co.*, 698 A.2d 859, 864 (Conn. 1997).

[¶21] Because of the purely economic nature of the medical malpractice claim here and the absence of any claim for personal injury to Lima, we conclude it is assignable. *See Standard Chartered PLC v. Price Waterhouse*, 945 P.2d 317, 327 (Ariz. Ct. App. 1996) ("our supreme court demonstrated that, for tort claims of an economic nature, the court continued to adhere to an assignability rule"); *New Hampshire Ins. Co., Inc. v. McCann*, 707 N.E.2d 332, 336 (Mass. 1999) (Discussing a legal malpractice claim assignment, the court states, "It is important to note that New Hampshire's claim is not for personal injury, but for economic loss. We think the claim should be assignable unless some clear rule of law or professional responsibility, or some matter of public policy necessitates that the assignment should not be enforced."). As presented in this case, the public policy reasons that weigh against assignment of malpractice claims are not present, so the general rule that a chose in action may be assigned remains applicable.

V

[¶22] Finally, under N.D.C.C. § 28-01-46, the district court granted a motion to dismiss without prejudice. Section 28-01-46 states, in pertinent part:

> Any action for injury or death alleging professional negligence by a physician, . . . must be dismissed without prejudice on motion unless the plaintiff serves upon the defendant an affidavit containing an

10

admissible expert opinion to support a prima facie case of professional negligence within three months of the commencement of the action. The court may set a later date for serving the affidavit for good cause shown by the plaintiff if the plaintiff's request for an extension of time is made before the expiration of the three-month period following commencement of the action. The expert's affidavit must [1] identify the name and business address of the expert, [2] indicate the expert's field of expertise, and [3] contain a brief summary of the basis for the expert's opinion. This section does not apply to unintentional failure to remove a foreign substance from within the body of a patient, or performance of a medical procedure upon the wrong patient, organ, limb, or other part of the patient's body, or other obvious occurrence.

N.D.C.C. § 28-01-46. Typically, a "dismissal without prejudice . . . is not appealable." *Cartwright v. Tong*, 2017 ND 146, ¶ 5, 896 N.W.2d 638. Yet "a dismissal without prejudice may be final and appealable if the plaintiff cannot cure the defect that led to dismissal, or if the dismissal has the practical effect of terminating the litigation in the plaintiff's chosen forum." *Id.* Because the time has expired for plaintiffs to amend the affidavit, the issue is appealable.

[¶23] "We have not precisely defined the standard of review to be employed by this court in reviewing a trial court's dismissal of a medical malpractice action under § 28-01-46, N.D.C.C." *Larsen v. Zarrett*, 498 N.W.2d 191, 195 n.2 (N.D. 1993). Although *Larsen* was applying a prior version of § 28-01-46, the amendments since 1981 do not alter the analysis of the standard of review. In *Larsen*, we examined both the summary judgment standard of review and an abuse of discretion under an evidentiary ruling standard of review. *Id.* We said that a "trial court's decision to dismiss a medical malpractice claim under the authority of § 28-01-46 does not fit neatly within the contours of either a typical summary judgment disposition or a typical evidentiary ruling." *Id.* Because the statute requires an affidavit within three months of commencing the action, a summary judgment standard of review is a poor fit. *Id.* Summary judgment ordinarily occurs after the parties have conducted more discovery than can typically be accomplished in three months. *Id.* Also, the result of a dismissal under the statute is harsher than the result of a typical evidentiary ruling. *Id.* Thus, "greater leniency for the plaintiff who is subject to a motion for dismissal under § 28-

11

01-46 may be required." *Id.* Where, as here, an affidavit is timely filed, we review a district court's dismissal under § 28-01-46 as follows. We will affirm the district court if, when looking at the affidavit in the light most favorable to the non-moving party, and assuming the facts alleged in the complaint are true, the affidavit does not "support a prima facie case of professional negligence" as asserted in the complaint. N.D.C.C. § 28-01-46.

[¶24] Section 28-01-46, N.D.C.C., was "enacted to prevent an actual trial in such cases where a medical malpractice plaintiff cannot substantiate a basis for the claim." *Pierce v. Anderson*, 2018 ND 131, ¶ 7, 912 N.W.2d 291. The purpose is an "attempt[] to minimize frivolous claims by requiring the plaintiff to produce an expert opinion to support the allegations of the negligence in the early stages of litigation." *Cartwright*, 2017 ND 146, ¶ 10, 896 N.W.2d 638. Under § 28-01-46, if a party moves for dismissal, the court must dismiss a medical malpractice claim, without prejudice, if the affidavit does not meet the requirements. The importance of the expert's affidavit in medical malpractice claims has been consistently recognized by this Court. *Pierce*, at ¶ 13; *see Fortier v. Traynor*, 330 N.W.2d 513, 517 (N.D. 1983) ("If we recognize, as we must, that it does not require a genius to draft a complaint it becomes apparent that more is needed than a mere allegation of negligence in a malpractice action." (footnote omitted)).

[¶25] Here, Dr. Weingarden's affidavit states his business address and his area of expertise. The district court determined the affidavit failed to include "a brief summary of the basis for the expert's opinion," N.D.C.C. § 28-01-46, which encompasses "evidence establishing the applicable standard of care, violation of that standard, and a causal relationship between the violation and the harm complained of." *Pierce*, 2018 ND 131, ¶ 12, 912 N.W.2d 291. Dr. Weingarden's affidavit stated he reviewed the medical records and found that "Lima did not meet the driving vision requirements under North Dakota Law" and that Dr. Bohn "deviated from the standard of care required of Optometrists in the State of North Dakota by allowing Lyle Lima to drive, despite the fact that he did not meet the driving vision

12

requirement." The district court found the affidavit did not support "the applicable standard of care" nor does it "give a minimal assertion of causation between deviation and the harm complained of." We disagree. From Dr. Weingarden's statements that Lima's vision was below the driving vision requirements and that Dr. Bohn violated the standard of care by allowing Lima to drive, we can infer that Dr. Weingarden's opinion on the standard of care was that Dr. Bohn should have warned Lima that his vision did not meet the legal standard to drive. In this situation, the affidavit need not expressly state that adequate vision is required to safely drive and that a driver whose vision does not meet legal standards will foreseeably cause driving accidents. Therefore, Dr. Weingarden's failure to explicitly describe this aspect of causation in his affidavit is not determinative here.

[¶26] We determine that the affidavit meets the low threshold set out in N.D.C.C. § 28-01-46 because the section's purpose "is to eliminate, at an early stage of the proceedings, frivolous or nuisance medical malpractice actions . . . [and the] statute provides for a preliminary screening of totally unsupported cases." *Ellefson v. Earnshow*, 499 N.W.2d 112, 114 (N.D. 1993). "The statute merely requires a plaintiff to come forward with an expert opinion to support the allegations of malpractice." *Id.* The timely affidavit here served the purpose of ensuring that this malpractice claim was not frivolous or unsupported. Thus, we reverse the district court's order dismissing the claims under N.D.C.C. § 28-01-46.

VI

[¶27] We have considered the plaintiff's remaining issues and arguments and conclude they are either without merit or unnecessary to our decision.

13

[¶28]   We affirm the judgment dismissing the third party claims, reverse the judgment dismissing the assigned claim, and remand for further proceedings.

[¶29]   Jerod E. Tufte
Daniel J. Crothers
Jon J. Jensen
Jay A. Schmitz, D.J.

[¶30]   The Honorable Jay A. Schmitz, D.J., and the Honorable Dale V. Sandstrom, Surrogate Judge, sitting in place of VandeWalle, C.J., and McEvers, J., disqualified.

**Sandstrom, Surrogate Judge, concurring and dissenting.**

[¶31]   I agree with the majority's analysis on assignability of Lyle Lima's claim and on the sufficiency of the medical expert affidavit. As to the majority's analysis on a medical provider's potential liability to third parties, I respectfully dissent.

[¶32]   Although on potential liability to third parties the opinion focuses on "failure to warn," this is not a failure-to-warn case. The complaint claims not mere "omission" but "commission." The complaint alleges that the medical provider affirmatively told the patient he could drive, not that Dr. Briana Bohn merely failed to warn him that he could not. Indeed, as alleged in the complaint, if Dr. Bohn had remained silent, the operative medical advice to the patient would have remained "you're legally blind and cannot drive." As alleged, Dr. Bohn told the patient he could drive and he did drive, killing Bradley Cichos and severely injuring five other passengers on a horse-drawn hay trailer.

[¶33]   In the opening sentence of section III on potential third-party liability, the opinion at ¶ 5 states, "Appellants argue Dr. Bohn owed a duty to the injured parties to warn Lima that his vision was below the minimum standard to operate an automobile." And at ¶ 16, the conclusion to the section, the opinion states, "We conclude a physician has no duty to third parties arising from the physician's failure to warn a patient about driving risks resulting from the patient's medical condition." The opinion underrepresents appellants' claim and substitutes for it a weaker one to address.

[¶34]   But as the amended complaint alleges at ¶ 22:

> Defendant Briana Bohn, O.D., failed to notify Lyle Lima that his vision did not meet the minimum requirements to operate a vehicle under North Dakota law. Instead, Dr. Bohn told Lyle Lima he could drive, with some restrictions.

Similarly, the appellants' brief at ¶ 4 summarizes:

> The April 2016 eye exam results showed Lima's vision was below the  minimum standards required to operate a vehicle under North Dakota law. Instead of informing Lima he could not legally drive, Dr. Briana Bohn told Lima he could drive with certain restrictions.

[¶35]   On the issue of liability to third parties, the district court based its decision on the opinion in *Estate of Witthoeft v. Kiskaddon*, 733 A.2d 623, 630 (Pa. 1999), and held that the deceased and other plaintiffs here were not foreseeable victims. I agree with the majority that the district court erred on the question of foreseeability, as the opinion states at ¶ 16: "The facts alleged in the complaint support an inference of foreseeability in the sense that a person with impaired vision who drives a motor vehicle foreseeably will cause a traffic accident." I would send the case back at this point for the facts to be developed.

[¶36]   We must remember that this case is at its earliest stage. The complaint has not been answered. There has been no discovery. The facts have not been developed. Our cases reflect that dismissal at the complaint stage is not favored and should occur only if the court is convinced it is impossible that facts could be developed to establish the claim. "In an appeal from a Rule 12(b) dismissal, we construe the complaint in the light most favorable to the plaintiff, taking as true the allegations in the complaint." *Ennis v. Dasovick*, 506 N.W.2d 386, 389 (N.D. 1993) (citations omitted). "A trial court should dismiss under Rule 12(b) only when certain it is impossible for the plaintiff to prove a claim for which relief can be granted." *Id*. Under this legal posture, for example, we must assume the patient was driving as authorized by Dr. Bohn.

[¶37]   Potential facts to be discovered could include the possibility that Dr. Bohn never reviewed the file. The file may have prominently flagged the certificate of

blindness. Macular degeneration is apparently irreversible and therefore it was impossible for both tests to be correct, and under such circumstances it may have been recklessness or gross negligence not to pursue it further. Possibly the doctor was rushing to go somewhere else. The facts may establish that no non-negligent doctor would have told this patient it was all right to drive under any circumstances. At this stage we don't know what the facts are, and these or other significant facts could emerge.

[¶38] The plaintiffs present cases showing courts have recognized medical negligence liability to third parties. They cite failure-to-warn cases—cases less egregious than that alleged here—as an illustration. In response the defendants cite other cases where failure to warn was held not to establish liability to third parties.

[¶39] The majority fails to analyze the cases put forward by the plaintiff and the public policy arguments they contain. It appears a plurality of the states recognize potential liability of doctors to third parties in certain circumstances. In *Davis v. S. Nassau Communities Hosp.*, 46 N.E.3d 614, 622 (N.Y. 2015), for example, the court extended the doctors' duty to include third parties "the best position to protect against the risk of harm."

[¶40] There are other cases where a party may be liable to third parties because of negligence. Wrongful death is an example. Although North Dakota and other states now have wrongful death statutes, there is also authority that wrongful death actions "can now be regarded as arising under the common law." The Restatement (Second) of Torts § 925, comment k states:

> "[T]here is no present public policy against allowing recovery for wrongful death," so that the right of action can now be regarded as arising under the common law. Most of the details of the right may be controlled by an existing statute or taken by analogy from one. When recognized, this common law right has been utilized to fill in unintended gaps in present statutes or to allow ameliorating common law principles to apply.

16

The United States Supreme Court quoted in part by the Restatement above appears to recognize common law wrongful death actions in maritime cases. *Moragne v. States Marine Lines, Inc.*, 398 U.S. 375, 390-403 (1970).

[¶41]   The majority puts forth a public policy analysis discussing the possibility that third-party liability could interfere with a doctor's medical judgment in deciding on a course of treatment. But this is not a choice-of-treatment case. The majority raises the possibility that a patient may be more negligent than the doctor. But many patients simply trust what their doctor tells them they can or cannot do. And even if the driver had greater negligence than the doctor, under our comparative fault, two or more persons or entities can be negligent and have liability.

[¶42]   The plaintiffs present cases showing courts have recognized medical negligence liability to third parties. They cite failure-to-warn cases—cases less egregious than that alleged here—as an illustration. In response the defendants cite other cases where failure to warn was held not to establish liability to third parties.

[¶43]   A logical flaw in the majority's reasoning is that even if there is not third-party liability for the less serious failure to warn, that does not preclude liability for the more serious incorrect—deadly—advice.

[¶44]   Consider a perhaps extreme but also potentially deadly analogy. There may be no negligence for a tenant to fail to warn his guest *not* to shoot his gun at the wall separating an adjoining apartment, but there well could be liability if he told his guest it was *okay* to do so. In that case, as in this case, serious bodily injury or death could be the result.

[¶45]   Case law has many examples where failure to warn or advise is not a problem but giving incorrect advice is. Here are some examples. "Being unaware is not synonymous with ill or erroneous advice." *Stewart v. State*, 845 So. 2d 744, 747 (Miss. Ct. App. 2003). "[R]elief is not warranted where counsel merely fails to inform a client about the various ramifications of gain time as opposed to volunteering incorrect information." *Henderson v. State*, 626 So. 2d 310, 311 (Fla. Dist. Ct. App. 1993) (citations omitted). "We find the reasoning of the . . . courts persuasive with

17

respect to the affirmative misrepresentation exception to the general rule regarding [no need to advise of] collateral consequences." *Rubio v. State*, 194 P.3d 1224, 1232 (Nev. 2008). "Because a defendant need not be informed of all possible collateral consequences, misinformation about a collateral consequence does not make a guilty plea involuntary per se. But affirmative misinformation about a collateral consequence may nevertheless create a manifest injustice if the defendant materially relied on that misinformation when deciding to plead guilty." *In re Reise*, 192 P.3d 949, 957 (Wash. Ct. App. 2008) (citations omitted).

[¶46] The cases cited above and others establish that there are circumstances in which incorrect advice is a problem when failure to warn or advise is not. On the other hand, the majority can cite no case holding—as it apparently does—that there is no difference between a failure to warn and giving incorrect—even deadly—advice.

[¶47] In this uncharted area of the law, we should move carefully and deliberately, waiting for the facts to be developed to inform any public policy decisions that courts may be compelled to make. The majority itself, at ¶ 6, sets forth factors several of which developing the facts in this case may inform:

> The court must balance the following factors when determining the existence of duty in each particular case: (1) foreseeability of harm to plaintiff; (2) degree of certainty that plaintiff suffered injury; (3) closeness of connection between defendant's conduct and injury suffered; (4) moral blame attached to defendant's conduct; (5) policy of preventing future harm; (6) extent of burden to defendant and the consequences to the community of imposing a duty to exercise care with resulting liability for breach; and (7) availability, cost and prevalence of insurance for the risk involved.

The importance of waiting for the facts to be developed is emphasized by the fact that every one of the cases cited by the majority in support of these factors is a summary judgment case. See *Bjerk v. Anderson*, 2018 ND 124, ¶ 10, 911 N.W.2d 343; *APM, LLLP v. TCI Ins. Agency, Inc.*, 2016 ND 66, ¶ 8, 877 N.W.2d 34; and *Hurt v. Freeland*, 1999 ND 12, ¶ 13, 589 N.W.2d 551. In fact every case cited in support of these factors in every one of these cases cited by the majority is a summary judgment case. *See Perius v. Nodak Mut. Ins. Co.*, 2010 ND 80, ¶ 9, 782 N.W.2d 355; *Rawlings*

18

*v. Fruhwirth*, 455 N.W.2d 574, 577 (N.D.1990); *Saltsman v. Sharp*, 2011 ND 172, ¶ 11, 803 N.W.2d 553; *M.M. v. Fargo Pub. Sch. Dist. #1*, 2010 ND 102, ¶ 9, 783 N.W.2d 806; *Schmidt v. Gateway Cmty. Fellowship*, 2010 ND 69, ¶ 8, 781 N.W.2d 200; *Iglehart v. Iglehart*, 2003 ND 154, ¶ 11, 670 N.W.2d 343; *Diegel v. City of West Fargo*, 546 N.W.2d 367, 370 (N.D. 1996).

[¶48]   If the facts turn out to be the most egregious possible, third-party liability may well be appropriate. If the facts are something less, a line may need to be drawn. Or perhaps on remand the issue here will become moot.

[¶49]   Dale V. Sandstrom, S.J.