**J.A.H., by Guardian and Next Friend, R.M.H., Appellant,**

v.

**WADLE & ASSOCIATES, P.C., and Anita Jordan, Appellees.**

No. 97–2124.

Supreme Court of Iowa.

Feb. 17, 1999.

Rehearing Denied March 12, 1999.

Brian L. Campbell and Gordon R. Fischer of Bradshaw, Fowler, Proctor & Fairgrave, P.C., Des Moines, for appellees.

Considered by McGIVERIN, C.J., and LAVORATO, NEUMAN, SNELL, and CADY, JJ.

LAVORATO, Justice.

The plaintiff, a minor child, sued the defendant mental health care providers for loss of parental consortium arising out of alleged negligent treatment of his mother, who was not a party to the lawsuit. Because we hold there is no cause of action under the facts of this case, we affirm the district court's order granting the defendants' motion for summary judgment.

## I.   Facts and Proceedings.

We will not refer to the real names of the child and his father and mother. Instead we will refer to the child as James, the father as Robert, and the mother as Silvia. In 1995 the district court dissolved the marriage of Robert and Silvia. The dissolution decree granted primary physical custody of their minor child, James, to Robert.

Following the marriage dissolution, Robert filed the present action on behalf of James against Silvia's mental health care providers, Anita Jordan and Wadle & Associates, P.C., for loss of parental consortium. The petition, filed in June 1996, alleged, among other things, that the defendants were negligent in their treatment of Silvia. More specifically, the petition alleged Jordan, a mental health therapist, through her negligent treatment of Silvia caused Silvia to develop false memories. These false memories, the petition further alleged, rendered Silvia unable to care for James, caused Silvia to become estranged from James, and diminished Silvia's affection for him. In addition, the petition alleged that Wadle & Associates, P.C., Jordan's employer, was responsible for Jordan's actions undertaken in the scope of her employment.

Jordan began treating Silvia in March 1994. At the time the lawsuit was filed, Jordan was still treating her. Jordan used a variety of treatments on Silvia including hyp-

Peter J. Leehey and Janece M. Valentine of Leehey & Valentine, Fort Dodge, for appellant.

nosis and participation in survivor group therapy.

In October 1998, the district court ultimately granted the defendants' motion for summary judgment, ruling that the defendants did not owe "a legal duty to third parties who are not patients."

It is from this ruling that Robert appeals. He contends the defendants owed a duty to James in rendering mental health care to his mother, Silvia.

## II. Scope of Review.

Summary judgment is proper when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Iowa R. Civ. P. 237(c). On review, "we examine the record before the district court to determine whether any material fact is in dispute, and if not, whether the district court correctly applied the law." *Shriver v. City of Okoboji*, 567 N.W.2d 397, 400 (Iowa 1997). When the only conflict concerns legal consequences flowing from undisputed facts, summary judgment is the proper remedy. *Id.*

## III. Duty.

**A. Framework of analysis.** The decisive issue is whether the defendants owed a duty to James in rendering mental health care to his mother. This court has never before considered whether a mental health care provider owes a duty to a nonpatient family member for alleged negligent treatment of the patient.

It is hornbook law that in any tort case the threshold question is whether the defendant owed a legal duty to the plaintiff. *Burton v. Des Moines Metro. Transit Auth.*, 530 N.W.2d 696, 699 (Iowa 1995). A legal duty "is defined by the relationship between individuals; it is a legal obligation imposed upon one individual for the benefit of another person or particularized class of persons." *Sankey v. Richenberger*, 456 N.W.2d 206, 209 (Iowa 1990). "Whether, under a given set of facts, such a duty exists is a question of law." *Leonard v. State*, 491 N.W.2d 508, 509 (Iowa 1992).

In deciding that question, three factors govern our analysis: (1) the relationship between the parties, (2) reasonable foreseeability of harm to the person who is injured, and (3) public policy considerations. *Id.* at 509–12. We use these factors under a balancing approach and not as three distinct and necessary elements. *Id.* at 512. In the end, whether· a duty exists is a policy decision based upon all relevant considerations that guide us to conclude a particular person is entitled to be protected from a particular type of harm. *Larsen v. United Fed. Sav. & Loan Ass'n*, 300 N.W.2d 281, 285 (Iowa 1981).

*Leonard* presents a good example of this approach in a factual scenario somewhat similar to the facts here. Parrish was a patient at a mental hospital. He was being treated for bipolar disorder. His condition improved to the point where the doctors discharged him with the recommendation that he receive outpatient treatment. They did so believing Parrish was cooperative with his treatment plan. A medical expert for the plaintiff stated by affidavit that Parrish was not as compliant with his treatment regimen as his doctors had reported. Parrish returned to his work as a contractor and hired the plaintiff to work for him. On the date of the incident, the pair skipped work ˙and spent the day drinking. Sometime during this drinking spree, Parrish without provocation beat Leonard severely. Leonard then sued the state for the injuries he had sustained.

We determined as a matter of law that a treating psychiatrist owed no duty of care to an individual member of the general public for decisions regarding treatment and release of mentally ill persons from confinement. *Leonard*, 491 N.W.2d at 512. We reversed the district court's ruling to the contrary on the defendants' motion for summary judgment and remanded for dismissal of the plaintiff's petition. *Id.*

Our whole analysis in *Leonard* centered on whether a treating psychiatrist had a duty to protect persons injured by a patient who is, or has been, under the psychiatrist's care. We first noted that generally a person has no duty to control the conduct of another, citing Restatement (Second) of Torts § 315 (1965).

*Id.* at 510. We then acknowledged that the rule is qualified by the following exceptions set out in the same section of the Restatement:

> (a) a special relation exists between the actor [psychiatrist] and the third person [patient] which imposes a duty upon the actor [psychiatrist] to control the third person's [patient's] conduct, or (b) a special relation exists between the actor [psychiatrist] and the other [victim] which gives to the other [victim] a right to protection.

*Id.* at 511 (quoting Restatement (Second) of Torts § 315 (1965)).

In addition, we noted that subparagraph (a), which pertained to the facts surrounding Leonard's case, was also governed by section 319 of the Restatement, which provides:

> One who takes charge of a third person whom he knows or should know to be likely to cause bodily harm to others if not controlled is under a duty to exercise reasonable care to control the third person to prevent him from doing such harm.

*Id.* (quoting Restatement (Second) of Torts § 319 (1965)).

We had little difficulty finding a special relationship existed between Parrish and his treating psychiatrist at the defendant hospital. *Id.* at 511. We therefore concluded the hospital had a duty to control Parrish's conduct, or at least not negligently release him from custody. *Id.* However, in doing so, we observed that the above-cited Restatement rules "did not answer the precise question before us: Does the duty to refrain from negligently releasing· dangerous persons from custody run from the custodian to the public at large or only to the reasonably foreseeable victims of the patient's dangerous tendencies?" *Id.* We noted decisions from other jurisdictions varied widely regarding the universe of persons to whom they would hold the doctor accountable. *Id.*

We were able to narrow our inquiry to the psychiatrist's duty to members of the general public because the plaintiff could claim no other status. *Id.* The plaintiff could claim no other status because (1) he did not know Parrish before Parrish's commitment or discharge, (2) Parrish had never voiced any threats against the plaintiff to Parrish's attending psychiatrist, and (3) there was no record evidence from which a reasonable person could find that the plaintiff belonged to a class of persons more endangered by Parrish's release than the public at large. *Id.*

Relying on our own case law involving duty questions under sections 315 and 319 of the Restatement, we noted that the scope of duty in these cases turned on the foreseeability of harm to the injured person. *Id.* We also noted these same cases "reflect[ed] strong public policy concerns about the potential for limitless liability when an individual's decision might affect the general public." *Id.* at 512. In balancing the factors on duty in favor of nonliability, we concluded that foreseeability was outweighed by public policy considerations:

> In the context of a psychiatrist's decision to release an involuntary mental patient, these same policy considerations apply. We believe that the *risk to the general public posed by the negligent release of dangerous mental patients would be far outweighed by the disservice to the general public if treating physicians were subject to civil liability for discharge decisions.*

*Id.* (emphasis added).

We described the consequences of a contrary decision this way:

> The treating physicians, in their evaluation of the case, well might believe that [the patient] could be allowed to leave the institution for a prescribed period and that his release on pass might contribute to his treatment and recovery. We do not believe that they should have to function under the threat of civil liability to members of the general public when making decisions about passes and releases.... The treating physicians would indulge every presumption in favor of further restraint, out of fear of being sued. Such a climate is not in the public interest.

*Id.* (quoting *Sherrill v. Wilson,* 653 S.W.2d 661, 664 (Mo.1983)).

We emphasized that our decision in favor of nonliability was compatible with the statutory and constitutional mandate to treat severely mentally impaired persons in the least

restrictive environment medically possible. *Id.* This mandate convinced us of two things. First, the psychiatrist would necessarily have to forecast the patient's likely behavior toward others upon release. Second, "if that prognosis were subject to second-guessing by any member of the public who might later be injured by the patient, it could severely chill the physician's capacity for decision making and ultimately threaten the integrity of our civil commitment system." *Id.*

Our decision in *Leonard* was narrowly confined:

> We need not decide what duty, if any, would attach to the discharge decision if the psychiatrist had reason to believe some particular person would be endangered by the patient's release. Facts that might alter our view of the physician's duty under such circumstances simply do not present themselves here. We merely hold that a psychiatrist owes no duty of care to any individual member of the general public for decisions regarding the treatment and release of mentally ill persons from confinement.

*Id.*

■ **B. Analysis.** The question in this case is whether a mental health care provider owes a duty to a nonpatient family member not to negligently treat the patient. *Leonard* provides the proper framework of analysis to decide this question of duty: relationship, foreseeability, and public policy considerations.

■ **1. Relationship.** A physician owes a duty to his patient to exercise the ordinary knowledge and skill of his or her profession in a reasonable and careful manner when undertaking the care and treatment of a patient. *Webb v. Jarvis,* 575 N.E.2d 992, 995 (Ind.1991). This duty arises from the contractual relationship entered into between the two. *Id.* Thus, the duty is based upon privity. *Id.* The summary judgment record here shows no such relationship between James and the defendants. The relationship is between his mother and the defendants. Privity is therefore lacking.

■ It is true that privity is not always required to establish duty. For example, we abandoned the requirement of privity involving accountants under limited circumstances. Those circumstances include situations where such professionals know or should foresee that the financial statements they are to prepare for their clients are to be used by a certain party or parties who will rely on the statements in extending credit or assuming liability. *Ryan v. Kanne,* 170 N.W.2d 395, 402 (Iowa 1969).

Another example is in the area of legal malpractice. The general rule is that "absent special circumstances such as fraud or collusion, an attorney is liable for professional malpractice only to a client." *Schreiner v. Scoville,* 410 N.W.2d 679, 681 (Iowa 1987). The rationale for the rule is that "if liability would be permitted to a third party without regard to privity, the parties to the contract would be deprived of their own agreement. Further, the duty to the general public resulting from abandonment of the privity requirement would place a potentially unlimited burden on lawyers." *Brody v. Ruby,* 267 N.W.2d 902, 906 (Iowa 1978); *accord Schreiner,* 410 N.W.2d at 681.

We observed in *Schreiner* that "[f]ollowing assaults on privity protection in other tort areas, it was inevitable some inroads would be made in the area of legal malpractice." *Schreiner,* 410 N.W.2d at 681.

We also observed that the trend in recent years has been to allow some relaxation of the privity standard "in severely limited situations." *Id.* Thus, we have allowed nonclient third-parties to recover "when as a direct result of the lawyer's professional negligence the testator's intent as expressed in the testamentary instruments is frustrated in whole or in part and the beneficiary's interest in the estate is lost, diminished, or unrealized." *Id.* at 683.

As far as the medical profession is concerned, we have relaxed the privity requirement even more so than we have in other professions. *See Freese v. Lemmon,* 210 N.W.2d 576 (Iowa 1973). In *Freese* the district court sustained the defendant-physician's motion to dismiss grounded on lack of privity, so on appeal this court had to accept as true the allegations of the petition. The

facts as alleged in the petition were these. The plaintiff was injured in a collision with a vehicle operated by the physician's patient. The collision occurred when the patient suffered a seizure, became unconscious, and unable to control his vehicle. The patient had suffered another seizure three months before the accident and had consulted the physician to diagnose and treat his condition and to advise him relative to it. *Id.*

We held the following allegations were sufficient to state a cause of action against the physician: the physician negligently (1) failed to employ recognized procedures to determine the cause of the patient's first seizure, (2) failed to advise the patient not to drive, (3) failed to warn the patient of the dangers of driving, and (4) advised the patient that he could drive. *Id.* at 579–80. This court reversed the district court's ruling in the face of allegations in the motion to dismiss that the physician owed a duty to the patient only and not to the plaintiff-motorist. The majority opinion neglected to discuss any public policy considerations for or against its holding. In contrast, the dissent took great pains to point out there was no authority to support such a broad rule and "public policy considerations make such an imposition of limitless liability indefensible." *Id.* at 581–84 (LeGrand, J., dissenting).

In *Leonard,* we refused to recognize a duty to a member of the general public based on sound public policy considerations. In *Freese,* on the other hand, a majority of this court recognized such a duty without a hint of public policy considerations. The one similarity was that privity was lacking in both cases. Thus, lack of privity is not necessarily determinative on the question of duty in medical negligence cases.

Here, there is neither a claim nor proof that a contractual relationship existed between James and the defendants concerning the defendants' treatment of Silvia. Thus, privity between James and the defendants was lacking. Nevertheless, under our framework of analysis, this lack of privity is not conclusive on the question of duty. We therefore proceed to foreseeability, the second factor under our framework of analysis.

**2. Foreseeability.** Robert insists foreseeability is the key factor on the question of duty and is determinative. Unlike the plaintiff in *Leonard,* Robert contends James was not under the circumstances a member of the "public at large." Rather, he continues, James was the one person most vulnerable to the fallout of the negligent mental health care provided to his mother, and the defendant-Jordan specifically knew that Silvia had a minor son who stood to be harmed by any deterioration in Silvia's mental status.

Robert asserts that any reasonable therapist should have recognized that mental health treatment that encouraged regressive periods and involved the risk of creating false memories could be detrimental to the parent-child relationship. He further asserts that because James was a specifically identifiable dependent child, it was foreseeable he would be damaged as a result of his mother receiving improper mental health treatment.

The summary judgment record belies Robert's claim that Silvia received improper mental health treatment. There is no expert testimony on behalf of James to support such a claim. The only evidence on the question comes via a deposition from the defendant-Jordan. Jordan began treating Silvia in March 1994. At the time, because of her mental condition, Silvia was in the hospital in a critical condition. She was being fed intravenously because she would neither eat nor drink. She was being catheterized twice daily. In a short period of time through Jordan's treatment, Silvia began eating and drinking on her own. Through Jordan's treatment, Silvia was able to leave the hospital and live on her own. She started classes at a community college on a part-time basis with the goal of completing college. Severe allergies that she had experienced in the past had almost completely disappeared.

Silvia corroborated Jordan's deposition testimony. According to her deposition, Silvia had progressed in her therapy to the point where in early 1997 she had become a full-time student with a grade point average of 3.97 in community college, was able to hold a part-time job, and had been accepted at a liberal arts college where she intended to work toward a bachelors degree in nursing.

She was able to wean herself off of all major medications except one. Jordan was still treating her twice a week. Silvia described her mental condition as much improved over the past three years. According to Silvia, "I am functioning much higher—at a much higher level in my life."

In May 1997, Silvia was engaged to be married and had received an outstanding student award at the community college. Her career goals included graduate school. She considered herself competent to make her own decisions.

Although this testimony is unrebutted, the defendants in the district court conceded for the purposes of the summary judgment motion that a fact question existed on the propriety of the treatment, leaving open the legal question of whether the defendants owed James a duty. We therefore continue our analysis on the duty question. We accept—without deciding—Robert's contention that it was foreseeable James would be damaged in the event his mother received improper mental health treatment. (Again, there is no record proof that the child-parent relationship was damaged. To the contrary, the record shows that during the period of the defendants' treatment, Silvia was able to reestablish and maintain a good relationship with her son.)

■ We reject, however, Robert's contention that foreseeability is determinative on the question of duty. *See Wetcher v. W.C.W.*, 868 S.W.2d 767, 769 (Tex.1994) (acknowledging harm to a parent accused of sexual abuse is foreseeable but holding foreseeability is not alone a sufficient basis for creating a new duty; court ultimately held mental health care practitioner owes no duty to parent not to negligently misdiagnose condition of child and thus psychologist could not be held liable to father for misdiagnosis that father had abused his child). That brings us to the final factor under our framework of analysis: public policy considerations.

3. **Public policy considerations.** Robert offers a policy reason why third parties who are within the group at risk for foreseeable harm should be allowed to assert claims against mental health care providers. Unless such claims are allowed, he says, the

negligent and harmful treatment may well continue unchecked because the patient is too emotionally altered to recognize the harm that has taken place.

We reject this paternalistic approach. It assumes that competent adults who voluntarily undergo mental health treatment cannot decide for themselves whether the treatment is beneficial, an assumption we believe is unjustified.

One court has denied recovery in a "false memory" case that a father had brought against a mental health care provider who was treating the father's adult daughter. *See Doe v. McKay*, 183 Ill.2d 272, 233 Ill.Dec. 310, 700 N.E.2d 1018 (1998). According to the complaint, while the daughter was undergoing treatment she supposedly discovered repressed memories of sexual abuse committed by the plaintiff-father when the daughter was about eleven years old and confronted her father about the abuse. The plaintiff denied ever abusing his daughter. One of the theories the plaintiff alleged was negligent treatment of his daughter which allegedly deprived him of his daughter's society and companionship. The negligence count did not allege that the father was a patient of the defendant. It did allege, however, the defendant was negligent toward the daughter. The daughter was not a party to the action and did not allege any malpractice by the defendant.

In affirming the trial court's dismissal of the negligence count, the appellate court said on the question of duty:

A number of considerations relevant to the duty analysis strongly militate against imposition of duty here.... Approval of the plaintiff's cause of action ... would mean that therapists generally, as well as other types of counselors, could be subject to suit by any nonpatient third party who is adversely affected by personal decisions perceived to be made by a patient in response to counseling. This result would, we believe, place therapists in a difficult position, requiring them to answer to competing demands and to divide their loyalty between sharply different interests. Concern about how a course of treatment

might affect third parties could easily influence the way in which therapists treat their patients. Under a rule imposing a duty of care to third parties, therapists would feel compelled to consider the possible effects of treatment choices on third parties and would have an incentive to compromise their treatment because of the threatened liability. This would be fundamentally inconsistent with the therapist's obligation to the patient.... Hoping to avoid liability to third parties, ... a therapist might instead find it necessary to deviate from the treatment the therapist would normally provide, to the patient's ultimate detriment. This would exact an intolerable high price from the patient-therapist relationship and would be destructive of that relationship.

*Id.* at 1023–24.

Turning to the question of confidentiality, the court emphasized that recognizing the negligence suit would also be inconsistent with the duty of confidentiality that every therapist owes to his or her patients. *Id.* at 1024. The court agreed with the defendant that the therapist could not properly defend the present action without revealing confidences revealed to the therapist by the patient. *Id.*

Commenting further on the confidentiality problem, the court went on to say:

Allowing a nonpatient's action against another person's therapist to go forward would seriously intrude on the relationship between therapist and patient, jeopardizing the confidentiality necessary for the relationship to flourish. As this case illustrates, the patient would be faced with a difficult choice between preserving the confidentiality of patient-therapist communications and assisting the therapist in responding to what must, to the patient's eyes, be a meritless action. The patient could either waive the privilege and permit the therapist to defend the action, while suffering the public disclosure of communications originally intended to remain private, or assert the privilege and maintain the confidentiality of the therapy, but at the price of denying the therapist, presum-

ably a valued friend, the use of potentially helpful evidence.

*Id.* at 1024.

The problem of divided loyalties and the need to preserve confidentiality—both public policy considerations—convinced the court to refrain from imposing a duty running from the therapist to nonpatient parties. *Id.* at 1024–25.

Preserving confidentiality in a mental health treatment setting is probably more important than in any other type of medical setting for the reasons we expressed in *McMaster v. Iowa Board of Psychology:*

Psychotherapy probes the core of the patient's personality. The patient's most intimate thoughts and emotions are exposed during the course of the treatment. The psychiatric patient confides [in his or her therapist] more utterly than anyone else in the world.... [H]e lays bare his entire self, his dreams, his fantasies, his sin, and his shame. The patient's innermost thoughts may be so frightening, embarrassing, shameful or morbid that the patient in therapy will struggle to remain sick, rather than to reveal those thoughts even to himself. The possibility that the psychotherapist could be compelled to reveal those communications to anyone ... can deter persons from seeking needed treatment and destroy treatment in progress.

509 N.W.2d 754, 758 (Iowa 1993) (quoting *Hawaii Psychiatric Soc'y v. Ariyoshi,* 481 F.Supp. 1028, 1039 (D.Haw.1979)).

In this summary judgment record there is evidence from Silvia that this suit has strained relations between Silvia's therapist and her, both potentially inhibiting and impeding the therapeutic benefits that would otherwise inure to her:

Q. I want you to talk about what this [lawsuit] has done to your ability to do therapy. A. It's had a tremendous affect on the way I am able to approach a therapeutic situation. I started therapy thinking and believing that this was a place I could talk about my feelings, my emotions, and it was private and safe. And that it was between my therapist and myself.

And because of this lawsuit, whenever I go into an appointment I wonder if what I talk about is going to end up in a court-room or in a newspaper article. And it's very hard to maintain a trusting relationship with somebody in that sort of situation.

....

Q. Have you had some difficulties because of the lawsuit with Anita [Jordan]? A. It has put a tremendous amount of strain on my therapy. It's rather hard to have your therapist involved in a lawsuit and I would have liked to have had her testify, too, how my progress has been, but because of the legal conflict it's made it very hard.

....

Q. So, basically, every time you open your mouth when you talk to Doctor Anita Jordan you have to think about how it's going to affect your custody case, this case, the case against Trinity Regional Hospital and the case against your parents? A. That is correct.... I have considered changing therapists solely because of this lawsuit.... When I look at the progress that I have made while I have been in treatment, I see lots of things I have improved in. And because of these lawsuits, I have to look to see if the situation is going to become so complicated that the therapeutic relationship is damaged to the point where it can't be resolved.

Eliminating the potential for divided loyalties and maintaining confidentiality will in the end preserve the relationship based on trust between patient and therapist. Such a relationship is an essential ingredient for successful treatment. We are convinced these public policy considerations far outweigh any threat of foreseeable harm to nonpatient family members. For these reasons we hold as a matter of law there is no duty running from the therapist to these members. The duty runs to the patient alone.

However, we limit our holding to the facts of this case. For example, we express no opinion on a mental health care provider's duty to protect an identifiable potential victim from a dangerous patient. We posed but

did not answer this question in *Leonard.* See *Leonard,* 491 N.W.2d at 512.

■ A competent adult who seeks mental health treatment is in the best position to make the judgment call on whether the treatment is proper and effective. If such an adult feels the treatment is inadequate and possibly harmful, he or she, but only he or she, can sue. If the patient does sue, loss-of-consortium claims like the one here would then be viable.

Here, we have a competent adult who has progressed through treatment to the point where she is making responsible decisions, succeeding in her goals, and clearly understanding what she wants to do with her life. In her eyes, this lawsuit interferes with and hinders her treatment. She has consistently resisted the lawsuit with her staunch refusal to waive confidentiality regarding her medical records. See Iowa Code § 622.10 (providing for testimonial privilege against disclosure of medical records where patient refuses to waive confidentiality). We respect her assessment that her treatment has put her on track to full recovery, and we eliminate any further roadblock to that recovery by upholding the district court's ruling.

■ In doing so, we reject Robert's second contention that James' consortium claim is viable because the child has an independent claim for loss of consortium based on the defendants' duty to his mother. Our public policy concerns are no less significant because of this independent claim. If the rule we establish today means anything, the rule ought to apply regardless of this independent claim. And we hold that it does.

The conclusions we reach make moot Robert's further contentions concerning Silvia's claim of confidentiality regarding her medical records pursuant to section 622.10. Even were we to reach those contentions, we would uphold the district court's ruling on them.

IV. Disposition.

In sum, based on public policy considerations, we conclude as a matter of law there is no duty running from a mental health care provider to nonpatient family members. We,

however, limit our holding to the facts of this case. Because the defendants owed no duty to the child, he has no viable cause of action against the defendants. We also conclude for public policy reasons that the child has no viable cause of action against the defendants even though his claim for loss of consortium is an independent one based on the defendants' duty to his mother.

Accordingly, we affirm the district court's summary judgment ruling and remand for an order dismissing the plaintiff's petition.

**AFFIRMED AND REMANDED.**