# IN THE COURT OF APPEALS OF IOWA

No. 19-0508
Filed August 5, 2020

**ERIC ZIEL and CAROL ZIEL,**
     Plaintiffs-Appellants,

**vs.**

**ENGERY PANEL STRUCTURES, INC. d/b/a EPS BUILDINGS,**
     Defendant-Appellee.
_____

Appeal from the Iowa District Court for Boone County, Steven J. Oeth, Judge.

Plaintiffs appeal from the district court's grant of summary judgment in favor of the defendant, a manufacturer-designer of a building on their land that collapsed during a windstorm. **AFFIRMED.**

Sean M. O'Brien of Bradshaw, Fowler, Proctor & Fairgrave, P.C., Des Moines, for appellant.

Brian P. Rickert and Thomas D. Story of Brown, Winick, Graves, Gross, Baskerville & Schoenebaum, P.L.C., Des Moines, for appellee.

Heard by Bower, C.J., and Doyle and Schumacher, JJ. Greer, J., takes no part.

**SCHUMACHER, Judge.**

Boone County landowners, husband and wife, sought to construct a large building for commercial and agricultural purposes. With the help of a construction contractor, the landowners selected a "pre-engineered" building made of structural insulated panels (SIPs). Having some building experience, the landowners assisted in construction by grading the site and hiring third parties to complete concrete and electrical work. As the construction contractor was nearing completion of the structure, the landowners arranged separately with a Des Moines company to install overhead doors, which had been excluded from the contract with the construction contractor and for which there were no specifications in the detailed drawings provided by the SIP manufacturer.

Approximately eleven months after completion, the largest of the building's overhead doors failed during a windstorm, precipitating the building's collapse. The wind speeds during the event measured less than the wind rating noted in the manufacturer's drawings but greater than the rating for the overhead door. The landowner brought suit in contract and tort against the manufacturer, the construction contractor, and the overhead door company. The landowners' claims against the manufacturer alleged that the manufacturer failed to warn of the need for all overhead doors to be wind-rated to ninety miles per hour and that the manufacturer was negligent in the design of the structure. This appeal arises from the district court's grant of summary judgment on both claims in favor of the manufacturer, which the court based on three findings: (1) the manufacturer owed no legal duty to the landowners, (2) the landowners' tort claims against the manufacturer were barred by the economic loss doctrine, and (3) a liability-limiting

provision in the warranty signed by the parties precluded the landowners' tort claims. We affirm the district court's determination that the manufacturer owed the plaintiffs no legal duty, and we find the economic loss doctrine applicable on these facts. We conclude the warranty was not an affirmative defense that the manufacturer needed to raise in the pleadings stage, and we find that the warranty would not have failed its essential purpose. We find to be unpreserved the landowners' argument that the manufacturer repudiated the warranty. We further find the warranty was not unconscionable. We affirm the district court's grant of summary judgment.

**Background Facts and Proceedings**

Eric and Carol Ziel (the Ziels) sought to erect a building on their land located near the grounds of the Farm Progress Show in Boone, Iowa. They selected a building sold by Energy Panel Structures, Inc. (EPS). EPS is a manufacturer of SIPs. EPS works through a network of third-party construction contractors that market, sell, and construct EPS buildings. EPS provides engineering expertise and drafts plans for the pre-engineered buildings that are then used by the contractor in the construction of the buildings.

The Ziels contracted with Lasco Construction Services, Inc. (Lasco) for the construction of the building. Lasco is an EPS dealer and served as the intermediary between EPS and the Ziels. The Ziels selected a building measuring 80 feet by 192 feet and provided input on where the cutouts for windows, entry doors, and large overhead doors would be. EPS played no part in the installation of the windows and doors. The Ziels and Lasco entered into a contract, and Lasco submitted a simple sketch of the building for EPS to review. EPS provided a pricing

sheet and detailed drawings to Lasco.  The drawings were drafted and reviewed by two professional engineers at EPS.

EPS designed the building to withstand winds of up to ninety miles per hour and noted this information on the drawings.  Under the "design loads" section of the drawings it was specified that the "wind load" was "90 mph."  The drawings included rough openings for doors and windows in accordance with the Ziels' desired dimensions and locations, however the drawings did not provide further technical specifications for the doors or windows.

The drawings were completed in early June 2012.  EPS forwarded the drawings and sent a price sheet to Lasco.  Lasco soon thereafter began constructing the building, as the Ziels hoped to have the building ready for use during the annual Farm Progress Show at the end of summer, which occurs on neighboring land.  Eric Ziel (Ziel) did grading work at the site and hired contractors to pour the concrete slab and complete electrical work.

On July 25, 2012, the building collapsed during a wind event while it was still under construction.  The cause of this collapse was deemed to be insufficient temporary bracing.  Ziel and Lasco subsequently entered into a new contract for a replacement building.  Construction on a second building was undertaken.

Ziel contracted with Overhead Door Company of Des Moines, Inc. (Overhead) to supply overhead doors for the project, including a large overhead door measuring sixteen feet by twenty-eight feet that was to be placed in the center of the building's west face.  Ziel selected the doors without input from Lasco or EPS, and Overhead installed the doors when the building was nearing completion.

The large western overhead door selected by Ziel was rated for winds as high as sixty-five miles per hour.

After Lasco completed the building, Lasco presented the Ziels with an EPS warranty. Lasco's president, EPS's president, and Ziel all signed the warranty. EPS warranted the building would be engineered "to meet the wind and snow loads specified for the Building." The warranty purported to limit EPS's obligations to repair or replacement: "EPS's obligations with regard to a valid claim under this warranty are limited to the repair or replacement (as determined by EPS) of the defective part or product and shall not include any cost to remove, install, reinstall, or ship the defective or replacement part or product." Additionally, the document purported to limit the Ziels' remedies to just those enumerated, and it disclaimed liability under a number of different theories:

> 4. THE WARRANTIES LISTED ABOVE THAT ARE PROVIDED DIRECTLY BY EPS CONSTITUTE THE SOLE AND EXCLUSIVE WARRANTIES FROM EPS TO OWNER AND THE REMEDIES FOR BREACH THEREOF ARE THE ONLY REMEDIES AVAILABLE UNDER SUCH WARRANTIES. EPS MAKES NO OTHER EXPRESS OR IMPLIED WARRANTIES AS TO THE PACKAGE OR THE BUILDING, INCLUDING WITHOUT LIMITATION ANY WARRANTIES OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE, AND NO PERSON, INCLUDING EMPLOYEES, REPRESENTATIVES OR AGENTS OF EPS, IS AUTHORIZED TO MAKE ANY REPRESENTATIONS OR WARRANTIES CONCERNING THE PACKAGE OR THE BUILDING ON BEHALF OF EPS. ALL OTHER WARRANTIES ARISING UNDER LAW ARE EXPRESSLY DISCLAIMED.
>
> 5. IN NO EVENT SHALL EPS BE LIABLE UNDER ANY THEORY OF RECOVERY, WHETHER BASED ON ANY THEORY OF NEGLIGENCE, STRICT LIABILITY, CONTRACT OR TORT, FOR ANY DIRECT, INDIRECT, SPECIAL, PUNITIVE, INCIDENTAL OR CONSEQUENTIAL DAMAGES OF ANY KIND OR NATURE WHICH IN ANY WAY ARISE OUT OF THE PURCHASE OF THE PACKAGE OR ANY USE OF THE BUILDING.

Ziel signed the warranty on September 12, 2012, and the building was put to use. Ziel installed a mezzanine and used the building without incident for almost one year. Then, the building collapsed on July 22, 2013, during a windstorm. Wind speeds during this storm were measured at approximately seventy-five miles per hour and did not exceed ninety miles per hour.

The Ziels and their insurer hired professional engineer Stephen Sciortino to investigate. Sciortino had prepared a report in response to the 2012 collapse, and he prepared a new report and gave deposition testimony regarding the 2013 collapse. With respect to the 2013 collapse, Sciortino noted that the large overhead door on the building's west face blew into the building toward the eastern wall. Sciortino believed "the collapse began when the western 16′x28′ door blew inward into the building."

EPS requested that professional engineer Duane Boice respond to the findings in Sciortino's report. Boice issued a letter disagreeing with many of Sciortino's findings, although he also found the collapse began when the large overhead door blew inward. Boice described the cause of the collapse as follows:

> The 16′x28′ door blew in which allowed the wind to pressurize the building. This internal pressure combined with the uplift forces pulled the trusses up off the top sill plate enough to allow the east wall to tip out. (The wall design requires restraint at the top sill plates.) Once the wall blew out; the east end of the trusses fell to the ground while the west end remained on the (now tilted) west wall.

The Ziels filed suit on September 2, 2016, against EPS, Lasco, and Overhead. In December 2018 and January 2019, the three defendants filed separate motions for summary judgment. On February 11, 2019, the district court held a hearing on the pending motions, and the parties agreed to proceed without

making a formal record. The court issued an order on March 1, 2019. In that order, the court denied Overhead's motion as moot due to a settlement. Lasco's motion was granted in part and denied in part, although the Ziels later dismissed their claims against Lasco. The court granted EPS's motion in full.

In granting EPS's motion, the court rested its decision on three grounds. First, the court found the Ziels' claims barred by the economic loss doctrine. Second, the court found as a matter of law with respect to both the negligent-design and failure-to-warn claims that EPS owed no legal duty to the Ziels. Third, the court found that the Ziels' claims against EPS were barred by the liability-limiting provisions in the warranty.

The Ziels filed a motion pursuant to Iowa Rule of Civil Procedure 1.904(2) asking the court to reconsider its grant of EPS's motion for summary judgment. The court denied the motion, and the Ziels appealed.

**Standard of Review**

On a grant of summary judgment, our review is as follows:

> In reviewing the grant of summary judgment . . . the question is whether the moving party demonstrated the absence of any genuine issue of material fact and showed entitlement to judgment on the merits as a matter of law. An issue of fact is 'material' only when the dispute is over facts that might affect the outcome of the suit, given the applicable governing law. The requirement of a 'genuine' issue of fact means that the evidence is such that a reasonable jury could return a verdict for the nonmoving party. Our task on appeal is to determine only whether a genuine issue of material fact exists and whether the law was correctly applied. We examine the record in a light most favorable to the party opposing the motion for summary judgment to determine if movant met his or her burden.

*Bill Grunder's Sons Constr., Inc. v. Ganzer*, 686 N.W.2d 193, 196 (Iowa 2004) (citations omitted).

**Discussion**

We affirm the district court's grant of summary judgment in favor of EPS. First, we agree with the district court's determination that EPS's contacts with the Ziels were insufficient to give rise to a legal duty. Second, we conclude that the economic loss doctrine applies to preclude the Ziels from bringing their claims in tort. Third, we find the warranty bars the Ziels' claims. We determine the warranty was not an affirmative defense that needed to be pled at the pleadings stage and the warranty would not fail its essential purpose. We find the Ziels' repudiation argument unpreserved, and we determine the warranty terms are not unconscionable.

### A. Legal Duty

The Ziels brought claims against EPS for both negligent design and failure to warn, and we agree with the district court's determination that EPS had no legal duty to the Ziels as to either claim.

> It is hornbook law that in any tort case the threshold question is whether the defendant owed a legal duty to the plaintiff. *Burton v. Des Moines Metro. Transit Auth.*, 530 N.W.2d 696, 699 (Iowa 1995). A legal duty "is defined by the relationship between individuals; it is a legal obligation imposed upon one individual for the benefit of another person or particularized class of persons." *Sankey v. Richenberger*, 456 N.W.2d 206, 209 (Iowa 1990). "Whether, under a given set of facts, such a duty exists is a question of law." *Leonard v. State*, 491 N.W.2d 508, 509 (Iowa 1992).
>
> In deciding that question, three factors govern our analysis: (1) the relationship between the parties, (2) reasonable foreseeability of harm to the person who is injured, and (3) public policy considerations. *Id.* at 509–12. We use these factors under a balancing approach and not as three distinct and necessary elements. *Id.* at 512. In the end, whether a duty exists is a policy decision based upon all relevant considerations that guide us to conclude a particular person is entitled to be protected from a particular type of harm. *Larsen v. United Fed. Sav. & Loan Ass'n*, 300 N.W.2d 281, 285 (Iowa 1981).

*J.A.H. ex rel. R.M.H. v. Wadle & Assocs., P.C.*, 589 N.W.2d 256, 258 (Iowa 1999). Although the three-factor test laid out in *J.A.H.* is a balancing test, we find the relationship between the parties, which was very limited, to be sufficiently tenuous so as to be dispositive here. Nonetheless, we consider all three factors.

On appeal, EPS points out that it had very limited contact with the Ziels. Construction of the Ziels' building commenced without a written contract between EPS and the Ziels. The EPS warranty was the only written agreement of any form between the parties, and it was presented to the Ziels by Lasco, a supplier of EPS products. The building's doors and windows were excluded from EPS's designs and Lasco's contract with the Ziels. Ziel himself contracted with Overhead for the purchase and installation of the door that failed. Although they disagreed as to the extent of the role played by the door failure, the parties' experts were in agreement that the failure of the large western overhead door was the event that precipitated the building's collapse. The experts both agreed the structural integrity of the building was compromised by the door's failure. Ziel's selection of the large overhead door occurred without any input from EPS. EPS's minimal input in the overall construction of the building is bolstered by the fact that Ziel contracted for others to install the concrete slab, wiring, and mezzanine. The on-site use of EPS's materials was undertaken by Lasco. On the whole, the relationship of EPS and the Ziels does not militate toward a finding that a duty was owed.

We next consider the reasonable foreseeability of harm. The harm here was not reasonably foreseeable to EPS, who merely provided a rough sketch of the building's skeleton, with no specifications for doors or windows. EPS is not a

supplier or installer of overhead doors and cannot be imputed to have knowledge of the manner in which such will fail. Given that the Ziels did not seek EPS's input on the appropriate door to install, EPS could not reasonably have foreseen the harm of a failed door, the selection of which was completely attributable to Ziel.

Finally, we consider public policy considerations. We do not think public policy requires a finding that EPS had a duty to the Ziels under these circumstances. Parties are free to contract to limit their responsibilities to merely a portion of a building's construction. Ziel approached the construction of this building in a piecemeal fashion, doing some of the work himself and hiring an assortment of contractors to complete different portions of the remaining tasks. We conclude that, from a public policy standpoint, it would be inappropriate to hold that EPS had a duty to ensure the integrity of the construction as a whole when its contribution was merely supplying a pre-engineered building.

Given our analysis of the three *J.A.H.* factors, we conclude EPS had no legal duty to the Ziels. We affirm the district court on this issue.

## B. Economic Loss Doctrine

The Ziels argue the economic loss doctrine should not apply here because the collapse of the building constituted a sudden or dangerous occurrence resulting from a general hazard in the nature of the building's construction. They further assert that the doctrine should not apply because the building damaged the Ziels' other property and because the doctrine does not apply to claims for professional negligence. Even if the collapse were attributable to EPS, we

disagree with the Ziels' contention that an exception to the economic loss doctrine applies or that the doctrine is inapplicable here.

Under the economic loss doctrine, "plaintiffs cannot recover in tort when they have suffered only economic harm." *Richards v. Midland Brick Sales Co.*, 551 N.W.2d 649, 650 (Iowa Ct. App. 1996). "The well-established general rule is that a plaintiff who has suffered only economic loss due to another's negligence has not been injured in a manner which is legally cognizable or compensable." *Neb. Innkeepers, Inc. v. Pittsburgh-Des Moines Corp.*, 345 N.W.2d 124, 126 (Iowa 1984). The purpose of the rule is to "prevent litigants with contract claims from litigating them inappropriately as tort claims." *Van Sickle Constr. Co. v. Wachovia Comm. Mortg., Inc.*, 783 N.W.2d 684, 693 (Iowa 2010).

The Ziels assert that the hazardous condition created by the building collapse suffices to allow a tort action against EPS under the doctrine established in *American Fire & Casualty Co. v. Ford Motor Co.*, 588 N.W.2d 437, 438–39 (Iowa 1999) (finding an exception to the economic loss doctrine where an automobile spontaneously and unforeseeably caught fire). We disagree that the doctrine of *American Fire* is applicable on these facts. Instead, we find *Determan v. Johnson*, 613 N.W.2d 259 (Iowa 2000), to be persuasive. In that case, the defendant home-seller limited its liability via contractual waivers. *Determan*, 613 N.W.2d at 260. The court applied the economic loss rule because there was no link between the defendants and a hazardous collapse, similar to the case at hand. *Id.* at 263. Although the home's sagging roof was in danger of collapsing, the plaintiff's recovery was "limited to repair of the defective construction," and recovery in tort was not permitted. *Id.* at 263–64. The court noted the plaintiff's claim was "based

on her unfulfilled expectations with respect to the quality of the home she purchased," and therefore held that recovery could only sound in contract. *Id.*

The facts of *Determan* differ slightly from the instant case, in that the sagging roof of the house in *Determan* had not fully collapsed, as the Ziels' building did here. *See id.* However, another court applied *Determan* on facts where roof collapse had in fact occurred. *See S. Ins. Co. v. CJG Enters., Inc.*, No. 3:15–cv–00131–RGE–SBJ, 2017 WL 3449610, at *3–4 (S.D. Iowa May 12, 2017). In *Southern Insurance*, an insurer brought a subrogation action against a construction contractor and a manufacturer of pre-engineered buildings after four hog-confinement barns constructed at the request of insured farmers suffered damage during a windstorm. *Id.* at *1–2. The damage included the collapse of roofs. *Id.* at *4. Although significant damage was realized during the storm, the court noted that the farmers "contracted for the buildings to withstand Iowa's mercurial weather." *Id.* The court observed, "Farmers expect barns to be structurally sound." *Id.* Because the insurer's claim arose from "unfilled expectations with respect to the bargained-for quality of the barns," the court declined to hold the economic loss doctrine inapplicable. *Id.* at *4–5. While *Southern Insurance* is not binding on this court, we agree with its reasoning, and we hold the collapse of the Ziels' building does not expand their contract claim into one of tort. As in *Southern Insurance*, the collapse of the Ziels' building reflected their "unfulfilled expectations with respect to the bargained-for quality of the [building]." *See id.* We decline to find the economic loss doctrine inapplicable on the theory that the hazardous nature of the collapse brought the Ziels' claims within an exception to the doctrine.

Next, the Ziels assert that Iowa has adopted the "other property" exception to the economic loss rule. For this proposition, they quote our decision in *Richards v. Midland Brick Sales Co.*, 551 N.W.2d 649, 651 (Iowa Ct. App. 1996):

> [L]osses in product liability cases are generally limited to physical harm to the plaintiff or physical harm to the property other than the product itself. Economic losses to the product itself are excluded.

(Citation omitted.) This statement from *Richards* does not explicitly adopt the rule that where a product fails and causes damage to other property, the damage to the other property may be recoverable in tort as opposed to as consequential damages in a contract action, and the Ziels cite to no Iowa case adopting such rule. In this case, we think the presence of property is relevant only to characterize the type of loss, not the type of action. Here, the damage was to the building itself and some of its contents. This distinguishes the case from the Minnesota case upon which the Ziels rely for the establishment of the "other property" exception, and the remaining case cited is an admiralty case not dealing with real property. *See Saratoga Fishing Co. v. J.M. Martinac & Co.*, 520 U.S. 875, 884–85 (1997) (admiralty); *Lloyd F. Smith Co. v. Den-Tal-Ez, Inc.*, 491 N.W.2d 11, 13–15 (Minn. 1992) (allowing recovery for property damage to a building after a defective dental chair started a fire, and relying on the example that "if a defective coffee pot starts a fire which burns down a building, the coffee pot purchaser could sue in tort as well as in breach of warranty for damages to the building").

*Southern Insurance* is again instructive; in that case, the court rejected the argument that a remedy in tort should be available to plaintiffs because there was "damage to a nearby feed silo, the gas lines, lighting and ceilings in the barns."

2017 WL 3449610, at *4. In refusing to find the economic loss doctrine inapplicable, the court said,

> [T]he damage to the . . . barns and the nearby property was a foreseeable result of the barns' alleged failure to perform properly during a windstorm. The damage to the barns' structure, as well as to property placed inside the barns, was a foreseeable consequence of the structural failure, and it was equally foreseeable that the structural deficiencies could damage other nearby structures, especially in the event of an Iowa windstorm.

*Id.* at *6. As in *Southern Insurance*, the damage to "property placed inside" the Ziels' building was a foreseeable consequence of the structural failure, which was contemplated in the agreement to erect the structure.

Finally, the Ziels claim that the economic loss doctrine is inapplicable because their claim is one of professional negligence. However, while the Ziels characterize their claim as professional negligence at the appellate level, they did not plead it as such at the trial level. Moreover, no case has exempted engineering negligence from the economic loss rule. *See Van Sickle Constr.*, 783 N.W.2d at 692 n.5 (noting economic losses are recoverable in professional negligence actions "against attorneys and accountants"). We therefore reject the argument.

## C. Applicability of Written Warranty

The district court found the Ziels' claims to be barred by the language of EPS's warranty, which was signed by the Ziels, Lasco, and EPS. The Ziels argue that EPS waived enforcement of the warranty by failing to plead the warranty limitation as an affirmative defense. The Ziels also argue the limitation provision is unconscionable and not broad enough to cover their claims, that EPS repudiated the warranty, and that the provision fails its essential purpose because it gives no

remedy for the design and specifications. EPS counters that the Ziels' repudiation argument was not properly preserved.

1. Affirmative Defense

We first consider whether the warranty is an affirmative defense, and we conclude the warranty did not need to be raised as an affirmative defense.

"An affirmative defense is one which rests on facts not necessary to support the plaintiff's case. Thus, any defense which would avoid liability although admitting the allegations of the petition is an affirmative defense." *Erickson v. Wright Welding Supply, Inc.*, 485 N.W.2d 82, 86 (Iowa 1992) (citations omitted); *see also* Iowa R. Civ. P. 1.419.

The Ziels cite two cases for the proposition that a defense premised on a limitation-of-liability clause is an affirmative defense. *See Fire Ass'n of Philadelphia v. Allis Chalmers Mfg. Co.*, 129 F. Supp. 335, 337 (N.D. Iowa 1955); *Smith v. All Stor Fort Knox, LLC*, No. 17-1537, 2018 WL 3913419, at *1 (Iowa Ct. App. Aug. 15, 2018). In both *Fire Association* and *Smith*, the defendant raised a limitation provision as an affirmative defense. 129 F. Supp. at 337; 2018 WL 3913419, at *1. The question of whether a liability-limitation provision *must* be raised as an affirmative defense was not raised. *See Fire Ass'n*, 129 F. Supp. at 337; *Smith*, 2018 WL 3913419, at *1. Similarly, a signed release of liability was raised as an affirmative defense in *Peak v. Adams*, 799 N.W.2d 535, 542 (Iowa 2011). We do not think these cases are dispositive, as these defendants' choices to raise liability-limiting provisions as an affirmative defense constitute a trend, not a rule.

EPS notes that, while no case directly controls, the Iowa Practice Series does not include "limitation of liability" in a list of affirmative defenses. *See* 11 Barry A. Lindahl, *Iowa Practice Series*, *Civil & Appellate Procedure* § 16:126 (May 2020 Update) (titled, "Other affirmative defenses").

Although it is not directly controlling, we find *Erickson* to be instructive. 485 N.W.2d 82. In *Erickson*, the court found that a statutory limitation-of-liability provision was not an affirmative defense that needed to be raised at the pleadings stage. *Id.* at 86. The court noted that the statute modified the elements to be proved in the plaintiff's case. *Id.* While the instant case has a contractual limitation-of-liability provision, not a statutory one, we think the reasoning of *Erickson* is applicable here. The Ziels sought to enforce the warranty prior to initiating suit. They were aware when filing suit they had agreed to a contractual limitation-of-liability clause, and it was incumbent upon them to prove its inapplicability after seeking to apply its beneficial repair-or-replace provision. As EPS points out, it should not come as a surprise to the Ziels that EPS would seek to use the warranty's provisions as a shield against the Ziels' tort claims.

We conclude under these facts that the contractual provision waiving liability for negligence and limiting an injured party's remedies is not an affirmative defense, and therefore EPS was not required to assert the waiver in its answer. Because we find the waiver need not have been raised as an affirmative defense, we do not reach EPS's contention that the waiver was tried by consent.

2. Warranty Repudiation and Essential Purpose

EPS argues the Ziels failed to preserve the argument that EPS repudiated the warranty. Under our error preservation rules "we will not consider a substantive

or procedural issue for the first time on appeal." *DeVoss v. State*, 648 N.W.2d 56, 60 (Iowa 2002); *see also Meier v. Senecaut*, 641 N.W.2d 532, 537 (Iowa 2002) (requiring that issues be raised before the district court "before we will decide them on appeal"). We note that the parties agreed at the hearing on the motions for summary judgment to proceed without making a formal record, so we have no transcript of any proceedings below. From our review of the record it appears the Ziels did not allege that EPS repudiated the warranty until they filed a brief in this appeal, and we therefore find the argument unpreserved.

We further find that the warranty would meet its essential purpose. The Ziels note in their brief that they "do not allege EPS supplied a damaged or defective component that requires repair or replacement." They instead allege they contracted for "a building engineered to meet the wind loads specified for the building." However, the building did meet the wind specifications; it was the door selected by Ziel that caused the failure. A replacement of the building would have put the Ziels in the same place they had been before Ziel installed a defective door. While the Ziels allege it was a design flaw that caused the collapse—namely, that EPS bears responsibility for not warning Ziel of the need for the door to be wind-rated—if the building were replaced, the Ziels would have knowledge of that flaw sufficient to correct the error in a rebuild. In other words, because the flaw precipitating the collapse was the result of a selection of door by the Ziels and the alleged lack of knowledge of the flaw was cured by the investigations following the collapse, a repair or replacement of the building would make the Ziels whole. For this reason, we hold the remedy provided would meet its essential purpose.

3. Unconscionability

The Ziels argue the warranty provisions are unconscionable. "[C]ourts generally enforce contractual limitations upon remedies unless such limitations are unconscionable." *C & J Vantage Leasing Co. v. Wolfe*, 795 N.W.2d 65, 77 (Iowa 2011).

> A contract is unconscionable where no person in his or her right senses would make it on the one hand, and no honest and fair person would accept it on the other hand. In considering such claims, we consider the factors of "assent, unfair surprise, notice, disparity of bargaining power, and substantive unfairness." However, the doctrine of unconscionability does not exist to rescue parties from bad bargains.
> This doctrine encompasses both procedural abuses arising from the contract's formation and substantive abuses related to the contract's terms. Procedural unconscionability involves an advantaged party's exploitation of a disadvantaged party's lack of understanding, unequal bargaining power between the parties, as well as the use of fine print and convoluted language. Substantive unconscionability involves whether or not the substantive terms of the agreement are so harsh or oppressive that no person in his or her right senses would make it. Finally, whether an agreement is unconscionable must be determined at the time it was entered.

*Id.* at 80–81 (citations omitted). We do not think the contract here at issue is unconscionable. First, we do not find the agreement procedurally unconscionable. Although the warranty was not presented until after the building was constructed, there is no indication in the record that the Ziels were forced to sign the document. The Ziels note that "EPS presented the warranty on a take it or leave it basis," but there is little evidence in the record that the Ziels were coerced into accepting the warranty. The Iowa Supreme Court rejected a similar argument in *Bartlett Grain Co., LP v. Sheeder*, 829 N.W.2d 18, 27 (Iowa 2013), where it held an allegation that "no negotiation was allowed" to be insufficient to give rise to a finding of unconscionability. Each word of the clauses limiting EPS's liability was printed in

all capital letters. Ziel testified to being "just a farmer," but he was not inexperienced in business matters; he hired contractors to do the electrical work, pour the concrete slab, and install the overhead doors on the very building in question. The Ziels have not alleged they were under unreasonable pressure to sign the contract. We therefore conclude the contract is not procedurally unconscionable. Second, we do not find the agreement substantively unconscionable. The Ziels received the benefit of a right to repair or replacement in exchange for a release of contractual and tort remedies. As EPS notes, similar remedy limitations have been upheld. *See, e.g.*, *Badgett Const. & Dev. Co. v. Kan-Build, Inc.*, 102 F. Supp.2d 1098, 1104–05 (S.D. Iowa 2000).

4. Scope of remedy-limiting provision

The Ziels argue the remedy-limiting provisions in the warranty are insufficiently broad in scope to cover the allegations here. We construe claims under contract provisions limiting liability for negligence strictly against the party seeking their enforcement. *See Sears, Roebuck & Co. v. Poling*, 81 N.W.2d 462, 465 (Iowa 1957). However, even construing the warranty provisions strictly against EPS, we cannot say their scope is insufficiently broad to cover the Ziels' claims. The relevant provision seeks to disclaim liability for claims arising from the "purchase of the package" or the "use of the building." We think the Ziels' claims arise as a result of the purchase of the package. We therefore reject the Ziels' textual argument.

**Conclusion**

We hold the economic loss doctrine applicable on these facts. We affirm the district court's holding that EPS did not owe the Ziels a legal duty sufficient to sustain claims in tort.

We find that the contractual limitation-of-liability provision here at issue need not have been raised during the pleading stage. We reject the Ziels' claim that the warranty would fail its essential purpose, and we find their repudiation argument unpreserved. The warranties terms are not unconscionable and are broad enough in scope to cover the facts of this case. For the foregoing reasons, we affirm the district court's grant of summary judgment in favor of EPS.

**AFFIRMED.**

Bower, C.J., concurs; Doyle, J., partially dissents.

**DOYLE, Judge** (concurring in part and dissenting in part)

I concur with the majority's affirmance of the district court's grant of summary judgment for Energy Panel Structures, Inc. (EPS), but I dissent from the majority's conclusion that EPS had no legal duty to the Ziels.

When confronting a case like this, the first question to be answered is: "What would have prevented this disaster?" The answer is simple: installation of a ninety miles per hour (mph) wind-rated overhead door. To that end, I believe EPS had a legal duty to warn that installation of a ninety mph wind-rated door was necessary for the building to maintain its warranted ninety mph wind rating.

EPS sold a product—a pre-engineered building rated to withstand winds up to ninety mph. The warranty EPS furnished to the Ziels states: "EPS warrants the building constructed from the Package ('Building') will be engineered to meet the wind and snow loads specified for the Building." EPS's price sheet furnished to Lasco Construction Services, Inc. (Lasco) states: "The wind load design is for 90 mph wind (Exposure B)." The drawings EPS furnished to Lasco specify: "Wind Load 90 mph." Although the drawings exclude doors and windows, there is no doubt the warranted wind rating was for a closed building—one with doors and windows installed. EPS was not contracted to engineer or supply the doors or windows because they were to be supplied by others. EPS did not provide or require minimum specifications for the doors and windows. Nor did it advise ninety mph wind-rated overhead doors were needed to maintain the building's warranted ninety mph wind rating. Eric Ziel contracted with Overhead Door Company to supply and install the overhead doors in the building. Ziel selected doors rated for up to sixty-five-mph winds. The building collapsed in a storm after one of the

overhead doors blew in and compromised the building's structural integrity. The winds in the storm exceeded sixty-five mph but were less than ninety mph.

Had EPS included minimum wind-rating specifications for the overhead doors to be installed in the building (and we note EPS included specifications for many of the building's other components it did not furnish), or given some notification or warning that to maintain the building's warranted ninety mph wind rating the large overhead doors would have to be similarly rated, it is likely Lasco would have informed Ziel. He would have either purchased the proper door—thus thwarting the disaster—or acted at his own peril in not doing so. But did EPS have a duty to warn of the need to install properly rated doors? The majority says no, I say yes.

"Our law has long recognized a duty to warn of the presence of defects or dangers. This duty is predicated upon superior knowledge, and arises when one may reasonably foresee danger of injury or damage to another less knowledgeable unless warned of the danger." *Lovick v. Wil-Rich*, 588 N.W.2d 688, 693 (Iowa 1999) (internal citation omitted). The duty to warn applies to manufacturers. *Id.* Under a balancing approach, we use three factors in deciding whether EPS had a duty to warn: "(1) the relationship between the parties, (2) reasonable foreseeability of harm to the person who is injured, and (3) public policy considerations." *J.A.H. ex rel. R.M.H. v. Wadle & Assocs., P.C.*, 589 N.W.2d 256, 258 (Iowa 1999). To be sure, there was little, if any, contact between the Ziels and EPS as Lasco was the dealer with direct contact with EPS. I agree with the majority that this would militate towards a finding no duty was owed. But the harm was reasonably foreseeable to EPS. It was EPS that engineered, designed, and

warranted the building to withstand wind loads of ninety mph. Although doors and windows were excluded from the drawings, the building's wind-load rating contemplated installation of adequate doors and windows. As designer and engineer of the building, EPS had superior knowledge as to what it would take to maintain the building's integrity in a wind storm. EPS could have reasonably foreseen that failure of an inadequate large overhead door in a wind storm would create a situation much like having no door at all, thus severely compromising the building's structural integrity. The building's structural integrity is only as good as its weakest link. To warrant this building with a ninety mph wind rating, it follows that the large overhead door would also have to be wind-rated at ninety mph. Public policy is clear. Manufacturers of products have a duty to warn of the presence of dangers in their products. *Lovick*, 588 N.W.2d at 693. EPS had a duty to warn or inform its buyers that the overhead doors needed to be wind-rated at ninety mph. It failed to do so.

Application of the economic loss doctrine is more problematic. "As a general proposition, the economic loss rule bars recovery in negligence when the plaintiff has suffered only economic loss." *Annett Holdings, Inc. v. Kum & Go, L.C.*, 801 N.W.2d 499, 503 (Iowa 2011). Failure-to-warn claims are negligence claims. *See Olson v. Prosoco, Inc.*, 522 N.W.2d 284, 289 (Iowa 1994). The Ziels argue their claim is excepted from the economic loss doctrine because their damage resulted from a sudden or dangerous occurrence resulting from a genuine hazard in the nature of a product defect and that they suffered damages to other property. I am unaware of a parallel to this case in our reported case law. The general contours of the doctrine were examined in *Annett*, 801 N.W.2d at 502–04, and

again in *Des Moines Flying Service, Inc. v. Aerial Services Inc.*, 880 N.W.2d 212, 218–20 (Iowa 2016). No attempt was made to delineate the precise contours of the rule. *See Annett*, 801 N.W.2d at 504. With no case on point and no precise guiding contours, I, like many judges, lawyers, and legal scholars, struggled to track the doctrine's meaning, application, and scope. *See* Jeffrey L. Goodman, Daniel R. Peacock, & Kevin J. Rutan, *A Guide To Understanding The Economic Loss Doctrine*, 67 Drake L. Rev. 1 (2019).

> While the doctrine may be easy to state, it is difficult to apply. Indeed, it has been described as a "confusing morass," and has been compared to the "ever-expanding, all-consuming alien life form portrayed in the 1958 B-movie classic *The Blob*" that could "consume much of tort law if left unchecked."

*Lesiak v. Cent. Valley Ag Coop., Inc.,* 808 N.W.2d 67, 80 (Neb. 2012) (footnotes omitted). And after reading the case law and trying to apply the economic loss doctrine to the facts of this case, I agree that the doctrine, like many civil doctrines,[1] is a "confusing morass."

The facts of *Determan v. Johnson*, 613 N.W.2d 259 (Iowa 2000), are close to the facts here but not on point. There, the plaintiffs' house suffered from significant structural defects manifesting themselves in the form of a sagging roof, among other things. *Determan*, 613 N.W.2d at 263. The roof was in danger of collapsing but had not yet done so. *Id.* In denying the plaintiffs' claims, the court applied the economic loss doctrine reasoning "any harm caused by the defects in the house was to the house itself, and not to any persons or other property. In

---

[1] *See Hill v. Damm*, 804 N.W.2d 95, 103 (Iowa Ct. App. 2011) (stating that the Restatement (Third) of Torts: Liability for Physical Harm provisions "seem as clear as mud").

addition . . . there has been no 'sudden or accidental occurrence.'" *Id.* at 264. In the case before us, the building did collapse in a sudden occurrence, and property other than the building was damaged.

In *American Fire & Casualty Co. v Ford Motor Co.*, 588 N.W.2d 437, 438 (Iowa 1999), the court allowed plaintiff to proceed with its products liability claim for the loss of a truck after it caught fire causing property damage to the truck and its contents. In examining the economic loss doctrine, the court noted, "The common thread running through our cases rejecting recovery is the lack of danger created by the defective product." *Am. Fire & Cas.*, 588 N.W.2d at 439. The court distinguished these cases concluding, "A truck starting itself on fire would certainly qualify more as a danger than as a disappointment." *Id.* at 439–40. I would think a sudden building collapse would qualify as a danger. But, as always, there is more. For even if damage from a defective product results from a sudden and dangerous occurrence and extends to surrounding property, the economic loss doctrine may bar tort recovery if the damage "was a foreseeable consequence from the failure of the product to work properly." *See id.* at 439. It was foreseeable that damage to the building's structure, as well as to property inside the building, would occur if the building collapsed during a windstorm. Although a razor-thin call, I concur with the majority that the economic loss doctrine bars the Ziels' negligence claims. So even had the majority concluded that EPS had a duty to warn, it would make no difference in the result here as that claim is barred by application of the economic loss doctrine. I therefore concur with the majority's affirmance of the district court's grant of summary judgment for EPS.